[Civ. No. 13811.   First Dist., Div. One.   Jan. 7, 1949.]

RAYMOND A. WILLSON, Respondent, v. TURNER RESILIENT FLOORS, INC., Appellant.

Keesling & Keesling, Henry C. Clausen and Francis Carroll for Appellant.

Bronson, Bronson & McKinnon for Respondent.

BRAY, J.—Appeal by defendant from a judgment after a jury verdict in favor of plaintiff in the sum of $20,659.51.[1]

Grounds of appeal: (1) insufficiency of evidence; (2) alleged errors in admission of evidence; (3) alleged abuse of discretion in denying motion to amend, and (4) in denying motion for new trial; and (5) error in giving certain instructions.

### PLEADINGS

There are three causes of action alleged: (1) Common count on an open book account. No evidence was offered on this count and it will not be considered further. (2) Common count for the reasonable value of services rendered. (3) A written agreement under which plaintiff was to receive "twenty-five per cent (25%) of the gross profit realized by defendants from sales made or estimated by plaintiff."

---

[1]This sum included $1,390.18 balance of salary which defendant conceded it owed plaintiff.

EVIDENCE SUFFICIENT TO SUPPORT VERDICT

Disregarding for the moment the question concerning whether plaintiff is limited to the oral rather than the written agreement, and bearing in mind that in view of the findings of the jury we are required to consider the evidence most favorable to plaintiff and the reasonable inferences therefrom, there is substantial evidence to support a finding that plaintiff was the procuring cause of the sales upon which the jury allowed a percentage. The evidence was highly conflicting. However, the testimony of plaintiff alone, if believed by the jury (and it was), was sufficient to support the verdict.

The action grew out of the employment by defendant of plaintiff as a salesman. Defendant is a national floor covering contracting concern, the largest of its kind in the United States, and has operated for over 20 years. It has five offices throughout the country, the home office being in Chicago. In 1941, the manager of the San Francisco office was Joseph A. Mancini. Plaintiff had been in the floor covering business since 1932, having worked with several different companies. His employment, before coming to defendant company, had always been on a commission basis. During September, 1941, plaintiff spoke to Mancini, at the suggestion of a mutual friend. An oral agreement was reached concerning the employment of plaintiff by defendant company. Mancini had authority to hire personnel, but only with the approval of an officer of the company. The oral agreement first entered into was approved by Akerstrom, president of the company. Plaintiff several times asked that the contract be reduced to writing. In November, 1942, about a year after plaintiff started working for defendant, he received a letter from Mancini, dated October 1, 1941, setting forth the terms of employment. Defendant contends that this letter was beyond Mancini's authority and that at no time until the litigation arose did the defendant have any knowledge of it, although Mancini testified he thought he put a copy of it in the local file at San Francisco. During 1942, Akerstrom knew that plaintiff was employed on a commission basis. Early in 1942, Mancini assigned plaintiff the Kaiser shipyards in Richmond as an area in which plaintiff should seek business for the company. From then until August, plaintiff obtained a number of contracts from Kaiser for defendant company, all fairly small jobs in connection with buildings, not ships. No other representative from defendant company solicited business at the Kaiser company yard No. 3 in Richmond. The company did no work for Kaiser except

jobs obtained by plaintiff. At the time Mancini wrote the letter he apparently had become disgruntled with the company and was arranging for employment with a rival concern. Mancini had a public stenographer type the letter on defendant's stationery instead of having it done at the office. No copy was sent to the home office, although the company required that copies of all important papers be sent there. In December, 1942, Mancini resigned.

Defendant contends that there were a number of "suspicious circumstances" in connection with the writing of this letter, which indicate that it was not written in good faith. However, that was a matter for the jury to consider, and upon which it found adversely to defendant.

So far as plaintiff's services are concerned, the main dispute centers around the sale to the Kaiser company, under contract VC-13, of a deck covering for ships, called Raybestos. Defendant contends that the contract was entirely negotiated by Akerstrom. Plaintiff contends that he was the procuring cause. Mancini had assigned to plaintiff the job of procuring all possible business from, among other places, the Kaiser shipyards at Richmond, and he was never told by anyone to refrain from soliciting any kind of business there. In addition to selling Kaiser company building materials not connected with ships, plaintiff made many inquiries of Kaiser officials regarding the plans for shipbuilding and possible bids, so as to be sure that defendant would be permitted to bid on deck covering jobs. In early August, 1942, plaintiff was told by Kaiser's contract man that the Raybestos deck-covering was open for bidding. The contract man took him to the purchasing agent. Plaintiff told the latter of his company's qualifications and asked to be permitted to bid. Plaintiff discussed the matter with both men on several occasions before the bid forms were sent to defendant. Thereafter plaintiff accompanied Akerstrom and defendant's labor superintendent to the shipyard to get the data for the bid. They measured the areas and plaintiff took down the quantities. That night plaintiff calculated quantities. He participated with Akerstrom and others in a four-hour discussion in the office regarding the price to be bid. Akerstrom drew up the bid. Plaintiff did not know what figures were on it. Plaintiff again visited the shipyard and discussed the matter with the contract man. In response to a call from the purchasing agent, plaintiff and Akerstrom went to the shipyard to discuss the bond. Plaintiff again met with the purchasing agent at the latter's request, to discuss

defendant's qualifications. Defendant was awarded a contract for decking for 30 ships. While the Raybestos job was in progress, plaintiff spent approximately 50 per cent of his time on it. The Navy at one time rejected defendant's material as combustible. Plaintiff discussed the matter with various officials of the Navy and Kaiser and succeeded in getting the contract reinstated. After the contract was obtained, some of defendant's job cost sheets carried plaintiff's initials in the proper column as "salesman." Akerstrom saw those sheets many times over a period of three years, and never asked about it, or required them to be changed. During 1944 and 1945, report sheets were sent by the San Francisco bookkeeper to the home office, as portions of the Raybestos job were completed. Several of these reports showed plaintiff's initials as "salesman." Akerstrom never questioned this.

Akerstrom testified that he was the one who obtained the Raybestos contract; that for over a year he had spent much time with the officials of Kaiser's New York procurement office, with the naval architect and the Maritime Commission, and thereby in March, 1942, had defendant placed on Kaiser's approved bid list. In March, 1942, he learned from one of the naval architect's men that Kaiser was going to call for bids on flooring. He wrote a letter soliciting the flooring job. On May 11, he wrote Mancini, sending him a copy of a revised bid he had sent Kaiser for flooring with linoleum. In April he learned from the naval architect man that instead of linoleum, Raybestos was to be required as flooring on all troopship jobs. In May, June and July, as a result of his activities, defendant was awarded contracts for Raybestos floor covering on ship decks in other parts of the United States, with companies other than Kaiser. In August, 1942, the Kaiser purchasing office was moved to Richmond, as was a division of the Maritime Commission, and his contact in the naval architect's office. In April, 1942, Akerstorm had directed Mancini not to make any bids for ship deck covering without his approval. In August, Akerstrom told Mancini concerning the Kaiser Richmond job: "I don't want anybody to do anything with this bid until I return, because I am going to handle it myself." This statement of Akerstrom was never communicated to plaintiff. Akerstrom stated that he learned of the Richmond Raybestos job from information relayed him from the New York office, and a representative of the union, and that he asked Kaiser Company at Richmond for an invitation to bid, and that the invitation came as a result of his activities.

Akerstrom figured the bid, drew it up, signed and personally delivered it to Kaiser at Richmond.

There is a large amount of detailed evidence to the effect that Akerstrom really obtained the contract and singlehandedly figured the bid, and that plaintiff merely made mechanical computations, which, if believed by the jury, would justify a finding that plaintiff was not the procuring cause of the contract. However, the jury believed plaintiff's version. Plaintiff does not claim that he actually made the bid, but that he was the procuring cause of the sale. A situation comparable to the one in the case at bar appears in *Chamberlain* v. *Abeles*, 88 Cal.App.2d 291 [198 P.2d 927], where the evidence showed that the plaintiff was not the one who "obtained" the sales contracts in question. The court pointed out that to be entitled to his commissions as the procuring cause, the agent does not necessarily have to consummate the transaction. The court said, quoting from *Brea* v. *McGlashan*, 3 Cal. App.2d 454 [39 P.2d 877] : " 'The word "procure" does not necessarily imply the formal consummation of an agreement. The Century Dictionary gives the following as the meanings of the word: " 'To bring about by care and pains; effect; contrive and effect; induce, cause, as he procured a law to be passed.' " In its broadest sense, the word means to prevail upon, induce or persuade a person to do something. . . . The originating cause, which ultimately led to the conclusion of the transaction, is held to be the procuring cause. (*Sessions* v. *Pacific Improvement Co.*, 57 Cal.App. 1 [206 P. 653].) And where the evidence is conflicting, the conclusion as to the procuring cause is one for the trial court and will not be disturbed on appeal. (*Jones* v. *Foster*, 116 Cal.App. 102, 108 [2 P.2d 582].) ' Where the agent is the procuring cause of the transaction which he was authorized to negotiate 'he is entitled to his commission irrespective of the fact that the principal himself, or through others, may have intervened and actually completed the final act of the negotiation. Accordingly an agent who was the procuring cause of the transaction is entitled to his commission irrespective of the fact that it was consummated by the principal, that he was not personally present when it was entered into, that it was consummated without his knowledge, or that he did not personally see or talk to the other party entering into the transaction.' [Citing cases.] "

Particularly is this so where the contract is to be let only after bids are submitted. Unless activities of the type related by plaintiff constitute a procuring cause, no salesman could

ever be held to be such where a bid has to be made. (See *Buhrmester* v. *Independent Plumbing & Heating Supply Co.*, (Mo.App.) 151 S.W.2d 509.)

The rule is set forth in Restatement, Agency, as follows:

"An agent whose compensation is conditional upon his accomplishment of a specified result is entitled to the agreed compensation if, and only if, he is the effective cause of accomplishing the result." (§ 448.)

"An agent is an 'effective cause,' as that phrase is used in this Section, when his efforts have been sufficiently important in achieving a result for the accomplishment of which the principal has promised to pay him so that it is just that the principal should pay the promised compensation to him." (Rest., Agency, § 448, com. a.)

Thus, the test is one of "fairness," and the question is one of fact for the jury. This is the rule as followed in this state. (*Bail* v. *Glantz*, 78 Cal.App. 49 [248 P. 258].)

In addition to "fairness," the cases set out other principles as a guide to the jury. The Brea case, *supra*, was brought by plaintiff to recover commissions allegedly owed because of radio advertising sold by plaintiff. In affirming a judgment for plaintiff, the reviewing court answered the argument that plaintiff had not actually "closed" the contract: "For otherwise, one might employ an agent to interview persons, and secure from them promises of contracts and then, by having another one 'close' the contracts, deny the agent the fruit of his labor. The law does not sanction such action. On the contrary, the rule is that if an agent (or broker) is the inducing or procuring cause of the contract, he is entitled to the commission, even though the principal takes it out of his own hand and completes it. The originating cause, which ultimately led to the conclusion of the transaction, is held to be the procuring cause. . . . Under the circumstances, the plaintiff should not be denied the fruits of her labor, merely because her employer saw fit to send others to receive the benefit of her soliciting." (3 Cal.App.2d 454, 465, 466.)

There is substantial evidence to support the conclusion that Akerstrom knew that Mancini had given plaintiff the Richmond shipyards as his territory, and that plaintiff was trying to sell the ship deck-covering contract. Admittedly, at the time of the negotiations for and at the time of the Kaiser contract, plaintiff was on the commission basis, of which fact Akerstrom was well aware. It seems unusual that Akerstrom would expect and permit a salesman to perform even the ser-

vices that Akerstrom admits plaintiff performed in connection with the deck-covering bid, if he was to receive nothing for his services. The evidence shows the normal division of labor between a salesman and a top executive.

*Howard* v. *The Winton Co.*, 199 Cal. 374 [249 P. 511, 47 A.L.R. 1012], and many other cases cited by defendant on the contention that Mancini had no authority to assign plaintiff the Richmond shipyards, are not in point, for here the evidence shows, first, that Mancini did have such authority, and secondly, if he did not, this assignment was ratified by Akerstrom's knowledge of plaintiff's activities there.

## ORAL OR WRITTEN EMPLOYMENT CONTRACT

■ So far we have considered the evidence without regard to the actual employment contract under which plaintiff was acting, for the reason that admittedly under either plaintiff was to receive a 25 per cent commission on all sales made by him. Under either, as he was the procuring cause of the sale, he was entitled to his commission. This brings us to the situation as to the written agreement (the Mancini letter).

While the plaintiff sued on both the oral and written agreements, the court instructed the jury only concerning the written one, except that in one instruction the court informed the jury that defendant had alleged that on or about October 1, 1941, it entered into an oral agreement of employment with plaintiff to pay him 25 per cent of the gross profits realized from final completion of orders and contracts secured personally by him through his own efforts, and that about January 1, 1943, both parties entered into another oral agreement terminating and cancelling the previous agreement and employing plaintiff thereafter at a fixed salary.

While the case was presented by plaintiff on the theory of a written contract, under the court's instructions the jury could have brought in a verdict (1) on the written contract, or (2) on defendant's theory that there was no written contract. The jury could have found under the evidence (as it did) that the employment contract, either oral or written, was not abrogated by any later agreement.

Practically speaking, the main difference between the oral agreement, which defendant admits was made by Mancini with plaintiff and approved by Akerstrom, and the written one, was that under the oral agreement plaintiff was to receive 25 per cent of the gross profits realized by defendant from final completion of contracts secured personally by plaintiff

through his own efforts; while in the written agreement he was to receive 25 per cent of the gross profits of all business "which you sell and/or estimate." The court more than once instructed the jury that in order for plaintiff to recover he must prove that he was the inducing cause of the Kaiser sale, and that he was not entitled to a commission merely because it was made to a shipyard where he had been assigned to make calls; "the only sales on which he is entitled to a commission are those which he himself has sold, if any." In view of the court's instructions to the jury, which in effect excluded business estimated by him, and limited recovery to sales which plaintiff himself made, the differences between the two contracts become immaterial. Plaintiff was entitled to recover on the oral as well as on the written agreement, as limited by the court's instructions.

The written agreement provided for a settlement at the end of each year for all jobs completed within that period; while it is contended that the oral agreement provided for settlement at final completion of the contracts secured. If these terms are not practically the same, their difference is immaterial. The written agreement defined gross profit, and provided that plaintiff was to receive payment of his percentage on the completion of his jobs, even though he left defendant's employ. While the oral agreement did not define gross profits or expressly provide that his leaving defendant's employ would not terminate his right to commissions on jobs he had obtained, it is not claimed that the definition in the written contract is any different from what both parties had in mind in the oral contract, and as matter of law, under the oral contract, plaintiff's leaving the defendant's employ either voluntarily or by discharge would not terminate his right to commissions, as the contracts were completed, on sales made by him.

While the Mancini letter stated that Mancini had not cleared with Akerstrom the question of plaintiff's getting his commissions in the event he left the company, it necessarily follows from the oral agreement that such would be the effect. This was the only notice given plaintiff of lack of approval of any term of the arrangement between him and the company.

There is so little difference between the two agreements (with the possible exception of the words "or estimate," which under the circumstances of the case is immaterial) that it is reasonable to infer from the evidence that Mancini actually

had the authority to write the letter in question. It is admitted that his employment of plaintiff was approved by Akerstrom, and there is nothing in the record which prohibited Mancini from putting the terms of that employment in writing. Under Mancini's contract with defendant it was provided that he could engage employees "upon the approval of the corporation." There was also a clause (par. 13) that "any and all contractual obligations of purchase, sale, or otherwise, arranged at the San Francisco Branch office, where the amount involved exceeds" $300, must be forwarded to the home office for approval and signature. It is obvious that this has nothing to do with employment. Paragraph 11 is the one concerning employment, and as pointed out before, it authorized Mancini to engage "any and all persons employed in the operation of the San Francisco branch office," and the only restriction is that he must get the approval of the corporation.

Plaintiff had the right to assume that with that authority and approval Mancini could put the arrangement in writing. While Akerstrom claimed at the trial that he authorized Mancini only orally to employ plaintiff, Akerstrom must have known at the time that a man of the ability which Mancini told Akerstrom plaintiff had, and who was to be employed to eliminate him as a competitor, would reasonably expect that a written memorandum of the terms of the employment would be given him. The defendant all along held Mancini out to plaintiff as having the authority which he assumed.

Defendant claims that the evidence does not support the amount the jury found due plaintiff as commissions. It is not necessary to detail the evidence here, but on the sales claimed by plaintiff and referred to in the evidence, defendant's gross profits were such that 25 per cent thereon equalled a sum approximately $18,000 in excess of that allowed by the jury. The difference is undoubtedly sufficient to take care of possible contract renegotiation.

### Was the Agreement Modified?

Defendant contends its agreement to pay plaintiff a percentage was terminated and replaced by a straight salary agreement. Under both the oral and written agreements, plaintiff was to have a drawing account of $250 per month, to apply against his commissions. In January, 1943, a conversation took place between plaintiff and Akerstrom. As to what was said the participants do not agree. Akerstrom claims

that it was agreed that in lieu of the commission arrangements, plaintiff would receive a straight salary of $10,000 per year, retroactive to the time when plaintiff first went to work for the company. A sum necessary to equal the difference between what plaintiff had received and $10,000 per year was paid plaintiff, and from then on he was paid monthly on a basis of that amount per year. Plaintiff, however, denied that the change in salary was to be in full of all services, but contended that it was still to be only payment on account of commissions.

Toward the end of 1943, plaintiff and Akerstrom had another conversation. Akerstrom testified that he suggested that plaintiff's salary be reduced to $6,000 per year, but that on plaintiff's promise to do better work, the salary was left at $10,000. Plaintiff testified, however, that the whole discussion was concerning commissions due plaintiff on Kaiser ships. Again in 1945, there was another meeting. Plaintiff testified that he wanted to get things settled about his commissions on the Kaiser contract, but that Akerstrom told him he would have to wait until the contract was completely closed on the books of the company. Akerstrom denied that there was any discussion of the Kaiser contract or commissions. Plaintiff testified that early in 1946 he asked Akerstrom for his commissions, as the Kaiser contract was completed. Akerstrom denied having such a conversation. Akerstrom returned to Chicago and wrote plaintiff a letter discharging him, and tendering a check for $1,390.18 as balance of salary and in full compensation, which check plaintiff refused.

Whether these conversations were as related by Akerstrom or by plaintiff, and whether the change to a salary was in lieu of the commission arrangement, were questions of fact for the jury. While the auditor of the company corroborated Akerstrom as to one of these conversations, the jury evidently believed plaintiff. In May, 1943, the auditor wrote plaintiff concerning a reconcilement of records, stating: "Inasmuch as $10,000 was the amount agreed on for your compensation up until the end of 1942 . . ." Plaintiff replied to this, setting forth the item of $10,000 as his "agreed compensation." These statements are not necessarily inconsistent with plaintiff's position, nor necessarily conclusive of defendant's, for $10,000 was approximately the amount of commissions due plaintiff at the end of 1942 under the original agreement. It is significant, too, that although defendant contends that the $10,000 per year was in lieu of commissions, in November, 1943, the

company made a deduction of $76.09 in plaintiff's account which Akerstrom said was an overpayment to plaintiff on commissions for the preceding year.

## No Error in Admission of Evidence

Defendant contends the court erred in the admission of the Mancini letter. As pointed out before, the evidence showed that Mancini did have the authority to write it, and that, at the least, the company held him out as having the authority. Moreover, if the admission of the agreement was error, it was nonprejudicial, as we have heretofore shown. There was no practical difference, so far as this case is concerned, between the oral and written agreements.

It is contended, too, that the court admitted testimony to vary the written contract, assuming there was one. The testimony primarily objected to concerned a discussion between Mancini and plaintiff in April, 1942, concerning Mancini assigning plaintiff to the Richmond shipyards for business. Obviously that in no way was varying the contract employing him as a salesman, which contract did not specify what particular territory he was to work in.

Mancini was asked if he had any discussion with plaintiff regarding employing him. Mancini replied that he had made an arrangement with plaintiff on the basis of 25 per cent of the gross profits. Defendant objected on the ground that as the written contract was in evidence, this was an attempt to state its contents. A discussion ensued, in which plaintiff stated that as the writing, although dated as of that time, was not prepared until later, he wanted to show how they carried on in the interim. The court indicated that it felt that the objection was good, but did not actually rule. Thereupon plaintiff asked Mancini "without going into the arrangements" if plaintiff was employed by defendant. If this was error, it was harmless.

## No Error in Denying Motion to Amend

Prior to trial, defendant filed an application under section 473 of the Code of Civil Procedure to amend its answer to set up the statute of limitations, noticing the hearing for the time of trial. At that time it was argued and submitted. On August 14, after the trial had ended, by an order *nunc pro tunc* as of July 7, the court denied the motion. While great liberality should be shown in permitting amendments

to pleadings (*Hyman* v. *Tarplee*, 64 Cal.App.2d 805 [149 P.2d 453]), the matter is one in the discretion of the trial court not to be interfered with by this court unless there is a manifest abuse of discretion. The plea of the statute of limitations is a dilatory one. ■ We cannot say that the trial court abused its discretion in refusing to permit defendant to set up this plea. Just how, in any event, the statute could apply, does not appear. Plaintiff was suing for the balance due him on his commissions, after deducting the advances made him by defendant. Under the law, the advances made to plaintiff would necessarily be credited on the commissions as they fell due plaintiff. Thus the older jobs would be paid off, leaving only the later jobs unpaid. Practically speaking, the whole amount in controversy was that accruing on the Kaiser ship jobs, all of which were finished within two years of filing suit.

## No Error in Instructions

Defendant complains of an instruction on ratification of the written agreement by defendant, contending that it intimated that if the services rendered by plaintiff were under the written agreement, the oral agreement, or the straight salary arrangement, the acceptance of such services would ratify the written agreement. Defendant reads into the instruction what is not there. It expressly limits the question to acceptance by defendant of plaintiff's services with knowledge by defendant of the terms and conditions of the written contract.

■ Defendant also complains of an instruction to the effect that the burden of proving that the original oral agreement was terminated by the alleged oral agreement of January 1, 1943, was on defendant. The court was instructing concerning defendant's defense alleged in its answer. Defendant contends that this instruction eliminated the possibility that plaintiff's evidence might have proved the facts of this defense. Defendant is confused between burden of proof and method of proof. The burden of proving the defense was on the defendant. If plaintiff produced evidence which the jury believed proved the defense, the defendant, of course, had met the burden of proof. As said in *Blanton* v. *Curry*, 20 Cal.2d 793 [129 P.2d 1], where the same objection was raised to a similar instruction: ''Appellants argue that the instruction did not clearly state the rule which is that the defendants have the burden of proving contributory negligence, *unless it affirmatively appears* from the plaintiffs' own evidence, citing

*Marr* v. *Whistler,* 49 Cal.App. 364, 371 [193 P. 600]; *Soda* v. *Marriott,* 118 Cal.App. 635, 642 [5 P.2d 675]. The rule, correctly stated, is that negligence on the part of a plaintiff is a matter of defense to be proved affirmatively by a defendant unless it can be inferred from the evidence given in the plaintiff's case. (*Marr* v. *Whistler, supra.*) In *Daniel* v. *Asbill,* 97 Cal.App. 731 [276 P. 149], the appellant claimed that a similar instruction was erroneous. In answering that argument the court held that the instruction was a correct statement of the law and did no more than inform the jury as to the question of the burden of proof; that if the defendant desired a further instruction to be given, he should have requested it, but, obviously, no harm could have resulted from the giving of the instruction." (P. 804.)

Moreover, defendant offered an instruction (No. 4) to the same effect.

## No Error in Denying Motion for New Trial

Defendant's motion for new trial was made on the same grounds as those on which this appeal is based. As we have shown, these grounds are not well founded.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 3, 1949.