[Civ. No. 14105. First Dist., Div. One. Nov. 27, 1950.]

LEON N. LEBOIRE, Respondent, v. KEN F. ROYCE, Appellant.

Freed, Gebauer & Freed for Appellant.

Jerome L. Schiller for Respondent.

PETERS, P. J.—The basic problem involved on this appeal can be stated as follows: A prospective purchaser, the defendant, unable to find sources of supply of desired materials, requests a broker, the plaintiff, to assist him in finding such materials. The broker finds a supplier and brings the purchaser and supplier together. The purchaser and broker enter into a contract whereby the purchaser agrees to pay the broker a 2½ per cent commission on the consummated deal, and on all other purchases made from the same supplier by the purchaser within one year of the date of the contract, the purchaser informing the broker that such future transactions may be entered into with others as purchasers. During the one-year period the purchaser desires to enter into further purchases from the same supplier, but, being unable to finance the transactions alone, enters into a joint venture with X to purchase such materials. The joint venture makes several large purchases from or through the same supplier within the one-year period. Is the broker entitled to a commission on these subsequent transactions under his contract with the purchaser?

The trial court, after a trial without a jury, answered this

question in the affirmative and held that the broker was entitled to a commission on these subsequent transactions. It entered its judgment in favor of the broker for $66,545.40, plus interest and costs. The purchaser appeals.

The facts, and the law applied to these facts, demonstrate that the trial court was correct. Ken F. Royce, the defendant, was engaged in the business of handling, storing, repairing, purchasing, selling and renting heavy construction equipment. Early in 1947 there was a shortage of such equipment. At that time Royce asked Leon N. Leboire, the plaintiff, an export-import broker, to assist him in locating such equipment. Leboire agreed to try and locate such equipment. He discovered some such equipment, and told Royce that he had received a call from Honolulu from one Davis, vice-president of the General Commodities Corporation, and that this company had been authorized by the Chinese government, which owned such equipment, to sell it. Royce told Leboire that he had tried to purchase such equipment from the Chinese government but had been unsuccessful. Pursuant to arrangements set in motion by Leboire, Davis came to San Francisco and met Royce. As a result of this meeting Royce purchased, through Davis, equipment valued at over $700,000. This will be referred to as the first purchase.

At or about this time it was contemplated between Royce and Leboire that the latter should go to Guam and arrange for the shipment of the purchased material to the United States. It was also contemplated that further purchases by Royce from or through Davis might be arranged, and it was agreed that Leboire should receive a commission on such future purchases if made within a year. The parties reduced their contract to writing on August 12, 1947, the very day the Royce-Davis contract was signed, the contract taking the form of a letter addressed to Leboire and signed by Royce. The latter requested Leboire to prepare the agreement and suggested its terms. The letter contains several interlineations in the handwriting of Royce. As corrected, it reads as follows:

"Dear Mr. Leboire:

"As per our agreement, it is understood I will pay you two and one half (2½) percent on the consummated deal of tractors purchased from the Chinese Government through or from Mr. Tom Davis, or through or from General Commodities Corporation, Ltd., covering the purchase of the following items: . . . [The items are listed.]

For the total sum of approx. $660,000.00  [The total purchase was over $700,000.]

Sincerely yours,

[Signed]  <u>Ken F. Royce</u>

Ken Royce

"Any further purchases from above parties within one year from to date [sic] will be subject to a commission to you.

[Initialed] K.F.R."

The main body of this contract was typewritten, but the postscript was added in the handwriting of Royce.

Leboire personally delivered the contract to Royce at the latter's office. At that time Royce stated that he had changed his mind about sending Leboire to Guam. Royce had directed Leboire to provide for a 2 per cent commission on the purchase already consummated, and a 3 per cent commission on future purchases, and the contract, as originally prepared, so provided. Royce struck out the travel portions of the contract, struck out the 2 per cent and 3 per cent provisions and inserted 2½ per cent and wrote and initialed the postscript. In explaining to Leboire why he was changing the commission provisions of the contract Royce stated: "I have changed my mind about sending you to Guam, and I am going to send somebody from the Morris Plan with my engineer, but I am going to, instead of 2 per cent, to give you 2½, and all the purchases that are made either by myself or with someone else, I am going to give you either 2½ or 3; leave it up to me. You know me . . . well enough, because I am going to get some other people interested in it. I have got a lot of people that are interested in buying equipment."

Royce was interested in purchasing more of the heavy equipment, but apparently was unable to finance further purchases. On August 22, 1947, 10 days after the date of the Royce-Leboire agreement, Royce entered into a joint venture contract with Hyman-Michaels Company, an Illinois corporation, for the purchase of such equipment. This agreement recites that both parties were familiar with the fact that there were large quantities of surplus of government equipment and other property available in the South Pacific and other parts of the Orient, but that because of the large financial requirements involved in the purchase of such equipment the parties have agreed to form a joint venture "for the purpose of engaging in the business of purchasing, renting, selling, importing, ex-

porting, reconditioning, financing and otherwise dealing in and disposing of surplus government and other property." The agreement recognizes that on the very day this contract was executed—August 22, 1947—Hyman-Michaels Company had entered into an agreement with General Commodities Corporation to purchase over a half million dollars worth of such equipment, and the agreement recognizes that such purchase was made on behalf of the joint venture. Under the agreement, profits and losses of the venture were to be divided 60 per cent to Hyman-Michaels Company and 40 per cent to Royce. The joint venture was to be managed by an executive committee consisting of two persons, one to be named by each party, disagreements to be settled by Michaels, the president of Hyman-Michaels Company.

Leboire, of course, was interested in collecting his commissions on the first and second purchases. Leboire was paid $10,000 by Royce as a part payment on the commission earned on the first purchase. Later Leboire was informed by Royce that Royce and Davis had agreed to share the burden of the commissions, and that each would pay him one-half of the commissions earned. Leboire called upon Davis. Davis gave Leboire a check for $7,097.27 as a portion of the commission earned on the second purchase. Leboire reported back to Royce that he was still owed a portion of his commissions on both the first and second purchases. Royce assured Leboire: "I will talk it over with Mr. Davis; you will get your pay." At this point Leboire was claiming $7,676 still due on the first purchase, and $7,097.27 as the other one-half of his commission due on the second purchase. After some discussion, Royce gave Leboire a check for $7,676 (the balance due as commission on the first purchase), and told Leboire that he was going to try to get the balance of the commission due on the second purchase from Everett Michaels, president of Hyman-Michaels Company. This last mentioned check had typed on it the words: "In full payment of commissions— Davis—August 12, 1947." Because of these words Leboire, acting under legal advice, did not cash this check. This was the first time that Leboire discovered that Hyman-Michaels Company was interested in the second purchase. Royce, during these discussions, told Leboire that Michaels was a partner in the second purchase.

The joint venture made two purchases from General Commodities Corporation, one, referred to above as the second purchase, for $568,065.89, and the other, constituting the

third purchase (a series of purchases), for over two million dollars. Deducting costs, the purchases by the joint venture from the General Commodities Corporation totaled $2,632,-971.39.

Admittedly there never was any agreement between Leboire and Hyman-Michaels Company whereby the latter agreed to pay the former a commission. Royce testified that he had mentioned to Michaels that Leboire might try to get a commission on the deals consummated by the joint venture. Moreover, in his deposition, used for purposes of impeachment, Royce testified that he tried to get a commission for Leboire from Hyman-Michaels Company because, although he did not feel obligated to Leboire "I thought if it can be arranged—he is a Brother Elk, and, of course—I felt it's all right, if I can help him make a commission, I would help him."

The contract resulting in the series of purchases referred to here as the third purchase of over two million dollars was made between General Commodities Corporation, Ltd., as seller, and Hyman-Michaels Company, on October 23, 1947. This contract was modified by an agreement dated January 14, 1948. Although both the original and modifying contracts refer to Hyman-Michaels Company as the buyer, the modifying agreement recognizes the existence of the joint venture. It states: "In this connection it is expressly understood and agreed that the Buyer and Ken Royce, Inc. have entered into a joint venture relating to the said property, and that where the term 'Buyer' is used herein, it is understood to include the said Ken Royce, Inc."

No further commissions were paid Leboire other than those mentioned above, whereupon this action was instituted.

The court found that the unpaid commissions owing to Leboire at the contract rate totaled $66,545.40, and judgment was entered accordingly.

The briefs of the parties are exhaustive. Appellant spends a large portion of his opening brief in analyzing and criticizing some of the arguments advanced by respondent in the trial court in support of his position. These arguments need not be considered. Even if sound, they would merely prove what the transaction was not. ▓ If there is any one theory that will support an affirmance, the judgment must be affirmed even though other sound or unsound theories are urged in support of the judgment.

The case turns upon the proper interpretation of the contract of August 12, 1947. That contract provides for a com-

mission on any future purchases made by Royce within a year from or through Davis. Does it provide for a commission by Royce when the subsequent purchases were made not by Royce individually but by a joint venture in which Royce had but a 40 per cent interest? That is the question. Even if the written contract were ambiguous on this issue, the ambiguity was removed by Royce. Leboire testified that Royce stated, when the contract was delivered, that it was to cover "all the purchases that are made either by myself or with someone else." Thus, by express agreement of the parties, the commission agreement was to cover any purchases made by Royce and any other co-purchaser. ▉ The conclusion follows that the contract provides for commissions on purchases made by the joint venture.

Even if the contract merely provided for commissions on purchases made by Royce, joint venture transactions would be included by implication. This problem is discussed in an annotation in 164 A.L.R. 949 entitled: "Broker's right to compensation as affected by the fact that customer procured by him joined with another in the purchase of the property involved." Supported by several well-reasoned cases the rule applicable to such situations is stated as follows (p. 949): "While a contrary conclusion is supported in a few cases in which it appears that there was an eventual sale to a partnership composed of the broker's customer and others, as will be noted below, it has generally been held or recognized that a broker's right to compensation is not affected by the fact that the customer procured by him became associated with others who joined with such customer in the purchase of the property involved." (In addition to the cases cited in the annotation in support of this rule see the following announcing the same principle—*Hilbert* v. *Shilby*, (D. of C. Mun.App.) 55 A.2d 856, 857; *White* v. *Grovier*, 237 Iowa 377 [21 N.W.2d 769, 772, 164 A.L.R. 943].)

That rule is in accord with logic and common sense. Royce was nonetheless the purchaser of the goods even though Hyman-Michaels Company joined with him in the purchase. A contrary rule would foster injustice. It would mean that any person could avoid a commission simply by joining another in the deal.

The appellant argues that Hyman-Michaels Company, not Royce, was the purchaser, and that Royce's sole function was to service the equipment and to recondition it. This contention is unequivocally refuted by the terms of the modifying

agreement of January 14, 1948, in which Royce is declared to be a buyer with Hyman-Michaels Company. This is also an answer to the next contention of appellant which is that the court made various findings to the effect that "defendant herein did purchase" the equipment. Appellant challenges these findings as being conclusions of law and contends that the evidence shows that Hyman-Michaels Company and not appellant was the purchaser. ■ The challenged findings are not subject to criticism. The court is not required to find the probative facts—it is sufficient to find the ultimate facts, and that is what was done here. The evidence demonstrates that appellant was a purchaser of the equipment.

■ One of the major contentions of appellant is that hearsay was erroneously and prejudically admitted during the redirect examination of Leboire. During the cross-examination of Leboire the witness was asked questions by counsel for Royce that brought out the fact that Royce had told Leboire to see Davis and collect from him half of the commission because Royce had arranged with Davis for the latter to pay Leboire 1¼ per cent of the commission. In response to further questions from Royce's counsel the witness testified that during the period in question he was seeing Davis about other deals in connection with other types of merchandise, and that, at one of these meetings, he asked Davis for his commission. The following then occurred:

"Q. It was on such an occasion as that that you asked Mr. Davis for some commission? A. I mean when we were alone, yes. Q. And you told him, did you, that Mr. Royce told you to come to him and get some money? A. That's right. Q. And Mr. Davis paid you some money, didn't he? A. Well, he says—— Q. Just a moment; I am asking—— A. He paid me on the second deal, yes. Q. I am asking you if he paid you some money? A. Yes."

This testimony was admittedly introduced by appellant in an attempt to support his special defense set up in his answer and counterclaim to the effect that Leboire was entitled to no commissions because he had acted illegally in attempting to act as agent for both Royce and Davis, and in attempting to secure commissions from Davis without the consent of Royce.

On redirect examination, counsel for Leboire, in an attempt to rebut the inference that Leboire had importuned Davis for money, without the knowledge of Royce, tried to introduce the balance of the conversation between Davis and Leboire. The direct question was asked as to what Leboire had said to Davis

and what Davis had said to Leboire in the conversation first mentioned in cross-examination. Appellant's counsel objected on the ground that this called for inadmissible hearsay. A long argument ensued, during which the cross-examination of Leboire was typed up and submitted to the court together with authorities. The court finally ruled that the conversation could be related because appellant's counsel had opened the door on cross-examination, and warned the witness to limit his answers to the questions asked and not to go beyond them. The following then occurred:

"A. I said to Mr. Davis that Mr. Royce sent me over to collect part of the commission that they agreed upon; that there was arrangements made evidently between Mr. Royce and Mr. Davis, according to Mr. Royce, that 'you were going to pay 1¼ per cent and he is going to pay 1¼ per cent.' Mr. Davis said, 'Yes, I did make the agreement with Mr. Royce on account of we have—we may have quite a bit of substitution to be made on some of the islands, because the original order could not be entirely filled as agreed, besides,' he told me, 'there is going to be quite a bit more merchandise bought by himself and others and he will be—he will have to pay 2½ per cent on all the purchases, so that is the reason I agreed to give him 1¼ per cent on the purchases that were to be made through myself through the General Commodities, and anything that I have anything to do with.' MR. SCHILLER: Q. Now, Mr. Leboire, was anything said about the amount at that time of the commission? A. Yes. Q. What did Mr. Davis tell you about the amount of commission? . . . A. And Mr. Davis said, 'Mr. Royce bought $720,000 worth of equipment and there is $18,000 commission due you. I gave him $9,000 cash already, gave it to Mr. Royce, so therefore you collect the full amount from Mr. Royce. On the second deal you have' —I don't remember exactly, but I know it was 14,000 and something—'and I am going to give you a check within a day or so, as soon as Sanger Hing'—he says, 'I think it was Sanger Hing—but I got it in my briefcase, I will give you the name— and Sanger Kai, who are officials of the General Commodities Corporation, sign the checks, I will give you my half of the second deal.' And he says, 'You go over there and get $18,000 from Mr. Royce; you will have to get $18,000 from Mr. Royce on the first deal. You will get $7,097 and something'—I don't remember, but I know it was 7,000—'and I will give you the other $7,000.' Q. Did he give you a check on that occasion? A. No; he did not. Q. When did you get

the check? A. A few days later. Q. And the amount of it was $7,097.27? A. That's right. MR. SCHILLER: That is all. THE COURT: Recross examination, if you desire to recross. MR. FREED: By recross I might be waiving some of our rights on the basis of objection made. I will not recross.''

It should be mentioned that this is not the only testimony about Davis paying part of the commission to Leboire. Appellant's counsel introduced into evidence, strangely enough over the objection of respondent, the check for $7,097.27 given by Davis to Leboire as payment for part of the commission on the second purchase. This check is 1¼ per cent of the amount of the second transaction. Without the challenged evidence above quoted, this check supports the inference that although Royce was responsible for the 2½ per cent commission, he had arranged with Davis that the latter should pay half the commission on the second purchase. There is no doubt that the trial court was much impressed with the check as a factor to be used in interpreting the contract. Thus, even if the challenged testimony were inadmissible as hearsay, which it is not, it is difficult to see how it could be prejudicial, inasmuch as there was other substantial evidence introduced by appellant on the same subject.

It seems quite clear that the challenged testimony was admissible. On cross-examination counsel for appellant saw fit to ask Leboire if he had not asked Davis for a commission, and also brought out other portions of this conversation. This opened the door for the introduction of the balance of the conversation. Section 1854 of the Code of Civil Procedure provides: ''When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing, which is necessary to make it understood, may also be given in evidence.''

Once appellant saw fit to place a part of the conversation before the court, the respondent, under this section, was legally entitled to bring out the balance of the conversation. Appellant was obviously trying to create the impression that Leboire was trying to collect improperly from both Royce and Davis without Royce's knowledge. To give some factual basis for this inference he asked Leboire about part of his conversation with Davis. Leboire, under section 1854, *supra,* was clearly entitled to introduce the balance of the conversa-

tion to demonstrate that what he received from Davis was part of his legitimate commission. (27 Cal.Jur. p. 105, § 80; *Sly* v. *Abbott*, 89 Cal.App. 209, 218 [264 P. 507]; *Hinton* v. *Welch*, 179 Cal. 463, 465 [177 P. 282]; *People* v. *Kynette*, 15 Cal.2d 731, 752 [104 P.2d 794].)

█ Appellant next urges that it was prejudicial error to sustain objections to questions asked of him by his counsel in reference to the circumstances under which the Royce-Hyman-Michaels contract was entered into. It is urged that these questions were relevant in that they bore on the issue of whether Leboire was the "procuring cause" of that contract, because, so it is claimed, the answers would have disclosed that Hyman-Michaels Company would have purchased the equipment whether or not Royce joined in the deal. The questions asked were very general. The two key questions were:

1. "Mr. Royce, how did you come to make a contract of joint venture with Hyman-Michaels?" and

2. "What were the circumstances under which you entered into a contract with Hyman-Michaels Company?"

These questions called for no particular conversation and were not concerned with facts but rather called for the opinions and conclusions of the witness. Moreover, no offer of proof was made. At no time did counsel disclose what he wanted to prove. In view of the very general nature of the questions, an offer of proof should have been made.

Another and conclusive answer to this contention is that the questions were not relevant to any issue before the court. It was not incumbent upon Leboire to prove that he was the procuring cause of the joint venture—General Commodities Corporation contracts. The contract before the court was between Royce and Leboire agreeing to pay a commission to Leboire on the deal already consummated and on future purchases by Royce made from the same seller within a year. The contract required Leboire to do nothing more than he had already done. Leboire was clearly the procuring cause of the first purchase. The evidence shows that he brought Royce and Davis together after Royce had been unable to make the desired purchases. (*Brea* v. *McGlashan*, 3 Cal.App.2d 454, 466 [39 P.2d 877]; *Willson* v. *Turner Resilient Floors, Inc.*, 89 Cal.App.2d 589, 596 [201 P.2d 406].)

█ The last contention of appellant relates to the measure of damages. The original contract between Royce and Hyman-Michaels Company, which was in effect when the sec-

ond purchase was made, provided for a division of profits and losses, 40 per cent to Royce and 60 per cent to Hyman-Michaels Company. In subsequent purchases the General Commodities Corporation retained a 30 per cent interest in the purchased materials so that the shares of Hyman-Michaels Company and of Royce were cut accordingly, Royce's share being reduced to 28 per cent. It is urged that, at most, Royce is only liable for 2½ per cent of 40 per cent of the amount of the second purchase, and 2½ per cent of 28 per cent of the subsequent purchases. This is a matter of interpretation of the contract. As interpreted by the trial court, the contract called for a 2½ per cent commission on all future purchases made by Royce or by Royce with others. Hyman-Michaels Company was not a party to the contract, nor is any attempt being made to charge it a commission. The contract was solely between Royce and Leboire, and the trial court properly interpreted it as calling for a full commission payable by Royce on any future purchases made by Royce alone or with others.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.