Filed 8/16/16  Orange Coast Marine v. Ocean Alexander California CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ORANGE COAST MARINE, INC., | |
| Plaintiff and Respondent, | G051347 |
| v. | (Super. Ct. No. 30-2012-00569077) |
| OCEAN ALEXANDER CALIFORNIA, INC., et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Mary Fingal Schulte, Judge.  Affirmed.

Rosenberg & Koffman, Ronald G. Rosenberg; Broedlow Lewis, Jeffrey Lewis and Kelly Broedlow Dunagan for Defendants and Appellants.

Stuart Kane, Donald J. Hamman and Eve A. Brackmann for Plaintiff and Respondent.

## I.  INTRODUCTION

Two yacht dealers with ties to the prominent Taiwanese yacht manufacturer "Ocean Alexander,"[1] appeal from a judgment for $179,104.50 in favor of an independent Newport Beach yacht dealer, Orange Coast Marine, Inc. (Orange Coast).  The judgment is for unpaid commissions in respect to two discrete yacht sales.  The first sale involved a new 64-foot Ocean Alexander yacht sold to a buyer named Halberda.  The other sale involved a new 78-foot Ocean Alexander yacht sold to a buyer named Smith.

The two Alexander appellants challenge the judgment on three fronts:  They say the statute of limitations on the Halberda sale was the two-year one that applies to oral contracts, not the four-year one for written ones, and the two-year statute ran prior to the filing of this action.  They next argue that even under a four-year statute of limitations, a mid-trial amendment allowing one of the two Alexander appellants to be brought into the case as Doe 1 was still too late because, as a matter of law, the amendment did not relate back to the original complaint.  Finally, they argue that there was a lack of substantial evidence to support a commission recovery by Orange Coast on the Smith sale, since no one from Orange Coast actually negotiated and consummated the transaction.

We affirm.  (1) The breach wasn't discovered within two years of the filing of this action, and in any event there was a writing sufficient to bring the Halberda transaction within the four-year statute of limitations.  (2) Ray Prokorym, Ocean Alexander's main contact person for Orange Coast, didn't know himself which Seattle-based Ocean Alexander entity he worked for until 2014, thus Orange Coast cannot be faulted for adding that entity as a Doe defendant in 2014.  And (3), substantial evidence shows that an Orange Coast salesperson was the procuring cause of the Smith sale – it

---

[1]     The dealers are Ocean Alexander Marine Yacht Sales, Inc. (OAMYS) and Ocean Alexander California, Inc., which is itself owned by OAMYS.  Because of the proliferation of corporate entities using various permutations of the words "ocean" and "Alexander" in their names, we will refer to *these* two specific entities as "the two Alexander appellants."

was he who interested the Smith family in upgrading to a brand new boat – and the law does not require such a salesperson to actually negotiate the transaction in order to earn a commission.

## II.  BACKGROUND

A. *The Parties*

Sorting through the parties is practically half this case, and bears directly on the problem of whether the amendment bringing one of the two Alexander appellants into the case related back to the original complaint.  Here is our attempt to piece together a picture of the Ocean Alexander yacht manufacturing and distributorship empire:

At the center is Ocean Alexander, a Taiwanese manufacturer of yachts. Ocean Alexander has a relatively memorable logo – a cresting wave inside a circle.[2] Beyond the manufacturer, there is a welter of captive Ocean Alexander yacht dealerships. This record contains references to no less than six such captive entities:

(1)  Ocean Alexander Marine Yacht Sales, acronymized in the record to "OAMYS."  OAMYS is based in Seattle.  Its stationery carries the manufacturer's wave-in-a-circle logo.

(2)  Ocean Alexander Seattle.

(3)  Alexander Marine U.S.A.

(4) Ocean Alexander of Washington.

(5) Ocean Alexander Florida.

(6) Ocean Alexander California, Inc.

The two Alexander dealership entities against whom the judgment was entered are OAMYS and Ocean Alexander California.  Ocean Alexander *California* is itself owned and operated by *Seattle-based* OAMYS.  To add to the confusing permutations of oceans and Alexanders, trial testimony revealed that Seattle-based

---

[2]     The logo is vaguely reminiscent of the logo of the insurance company that has an outline of the rock of Gibraltar inside a circle.

3

OAMYS has a successor entity, Alexander Marine U.S.A. But the record also indicates there have been at least two other Ocean Alexander dealerships based in Washington state: Ocean Alexander Seattle and Ocean Alexander Washington. (The latter wasn't formed until 2010.) And as if to guarantee confusion among the Ocean Alexander dealership entities, at least three separate times in trial the owner of the plaintiff, James McClaren – who had dealt with the Ocean Alexander organization for almost 30 years – became confused on the stand as to whether he was referring to "Alexander Marine" or "Ocean Alexander."

For its part, the plaintiff, Orange Coast,[3] was once a part of the Alexander dealership constellation, but not as a captive dealer like Ocean Alexander Seattle, Ocean Alexander Washington or OAMYS. Rather, Orange Coast was an independent dealer of Ocean Alexander yachts based in Newport Beach.

In 1984, Orange Coast was appointed as Ocean Alexander's Southern California dealer. The arrangement at the time was oral, though there is no dispute as to its basic terms: The right to a commission followed the geography of the buyer. Thus, for example, Orange Coast was entitled to receive a commission of six percent on the sale of a new Ocean Alexander boat if the customer came from Southern California, but it would owe the Florida dealership a six percent commission if it sold a boat in its inventory to a customer in Florida. The six percent was calculated on the total sales price.

B. *The Halberda Sale*

In January 2009, a new 64-foot Ocean Alexander boat located in Seattle was sold to a Southern California customer named Halberda. Halberda needed to trade in his existing boat, a 47-foot Riviera (Riviera is a manufacturer's name, like Ford) for the

---

[3] Technically, Orange Coast Marine, Inc., an entity owned by James McClaren. Since the word "Marine" shows up in several defendant entities as well, and keeping track of the the various entities involved in this case is hard enough as it is, we simplify by shortening to "Orange Coast."

new Ocean Alexander vessel. The trade-in, however, complicated the commission payment. Ocean Alexander agreed with Orange Coast that Orange Coast would be *immediately* paid its normal six percent commission on the cash portion of the sale (i.e., price of the new boat minus the credit given the buyer on the trade-in), but Orange Coast would wait on the sale of the Riviera boat for the balance. A May 2009 email from Ray Prokorym, an Ocean Alexander contact person in Seattle, was clear that when the Riviera boat was sold, additional commission would be paid "on the net from *that* sale," clearly referring to the sale of the Riviera boat. (Italics added.)[4]

The sale of the Riviera boat took some time. A potential deal to sell it "stalled out" in September 2009, and the record indicates the boat was not actually sold until February 2, 2010, to a Canadian dealer for about $635,000. Orange Coast learned of the fact of the sale about the same time. It then waited patiently (in retrospect, perhaps too patiently) for payment.

In the interim – in October 2009, to be specific – Ocean Alexander, the manufacturer, formally terminated its dealership agreement with Orange Coast. The termination generated its own problems: Ocean Alexander replaced Orange Coast with its own captive dealership, Ocean Alexander California, and naturally wanted Orange Coast to remove any residual statements from its website to the effect it was the exclusive dealer for Ocean Alexander boats.[5] So, when, in February 2010, Orange Coast inquired on the balance of the commission owed on the sale of the Riviera boat, Ocean Alexander's response was to say, in substance, that Ocean Alexander didn't owe anything

---

[4] Prokorym's involvement in this case is pervasive. He represented Ocean Alexander's Seattle-based operations and was the person with whom Orange Coast dealt most of the time, but it was never quite clear which specific Ocean Alexander entity he worked for. In fact, it wasn't until February 2014 (coincident with the beginning of trial) that Prokorym *himself* learned from higher-ups in the Ocean Alexander organization (Joe Ahladis and Richard Allender) that he actually worked for OAMYS. Even in January 2014, he did not know which entity his boss Richard Allender worked for.

[5] Ocean Alexander's unhappiness with Orange Coast's lethargy in removing statements it was the area's exclusive Ocean Alexander dealer led to a cross-complaint, which was rejected by the trial court. No appeal has been taken from the judgment in favor of Orange Coast on the cross-complaint.

on the commission, but "in the spirit of ongoing cooperation" it *might* be "able to accommodate a courtesy payment" to Orange Coast *if* Orange Coast promptly removed the offending website statements it was an Ocean Alexander dealer.[6]

Within a few weeks Orange Coast promised to remove its statements. Orange Coast's owner McClaren acknowledged he should have done it "earlier but it was an oversight." Still, that left the question of the balance of the commission unsettled, or at least unsettled in McClaren's mind. McClaren inquired of Prokorym on the topic in June 2011, and Prokoyrm said any fees paid went to an outside broker.[7] The two Alexander appellants make no argument that there *wasn't* a contract to pay commission on the Riviera boat or that the contract was somehow properly repudiated by Orange Coast's delay in removing statements about being an Ocean Alexander dealer. Their entire appeal on the Halberda sale is focused on the running of the statute of limitations.

C. *The Smith Sale*

In May 2011, Orange Coast salesperson Jason Grayshock had a preexisting relationship with an air conditioning mogul named Smith and with Smith's family. Grayshock had previously sold a 64-foot Ocean Alexander boat to Smith, for which Orange Coast had been paid a five percent finder's fee. Grayshock also doubled as part-time captain of that boat, and had overseen the upgrades that Smith had desired in the course of its purchase.

Grayshock knew the Smiths were potentially in the market for a new boat, and met with them on their 64-footer to discuss a purchase. Initially the Smiths thought they might only want another 64-footer, but Grayshock did his best to talk them into buying a bigger boat. As it happened, Grayshock soon met an Ocean Alexander manager

---

[6]    The letter was written on stationery with the Ocean Alexander wave-in-a-circle logo, but signed by Richard Allender, described as president of OAMYS and listing a Seattle address.

[7]    The two Alexander appellants make no argument that there *wasn't* a contract to pay commission on the Riviera boat or that the contract was somehow properly repudiated by Orange Coast's delay in removing statements about being an Ocean Alexander dealer. Their entire appeal on the Halberda sale is focused on the running of the statute of limitations.

at a Newport Harbor shipyard, and learned there was a brand new 78-footer Ocean Alexander boat coming in. He told Grayshock he should "check it out," which Grayshock did.

Grayshock then made a call to Smith, telling him there was a brand-new 78-foot Ocean Alexander boat being prepared for the upcoming Lido Boat show. Grayshock told Smith he'd get passes for the Smith family and take them to see the boat. He met them at the Lido show, "escorted them down to the show," and brought them to the new boat.

Prior to Grayshock meeting Smith at the show, Grayshock and Prokorym negotiated a commission arrangement. The reasonable inference from the evidence is that Prokorym agreed to a four percent finder's fee, and blocked off the boat from other viewers at the Lido show so that Grayshock could make his sales pitch. Grayshock spent at least 45 minutes (maybe more than an hour) with Smith and family on the boat.

The Smiths told Grayshock they were ready to make an offer on the boat, using their existing 64-footer as a trade-in. But Grayshock did not have a sales contract with him, so he hurried off to Orange Coast's office three miles away to get one. On the way, though, he received a call from Smith saying Grayshock would "no longer [be] involved in the negotiations" and the family was going to deal with Prokorym, directly. Thereafter, Prokorym called Grayshock to say he would not be able to pay a finder's fee of more than three percent, the inference being that Smith was insisting on a lower price to come out of Grayshock's fee. When Grayshock ran the proposal by McClaren, McClaren balked at the reduction and insisted on the original four percent. Consequently Smith ended up buying directly from Ocean Alexander's "Seattle people," and nothing was paid to Grayshock or Orange Coast.

D. *The Litigation*

The original complaint was filed in May 2012. It listed as defendants Ocean Alexander California, Ocean Alexander Washington, and Prokorym. Ocean

7

Alexander California responded with a cross-complaint, largely based on Orange Coast's having allegedly undercut its business as the successor Ocean Alexander dealer for Southern California.

Trial commenced on February 24, 2014, in Judge Luis Rodriguez's court, and during trial Prokorym testified that over the entire relevant time period he had only worked for OAMYS, as distinct from Ocean Alexander of Washington. Given that Prokorym had also signed documents and contracts on behalf of Ocean Alexander California and Ocean Alexander Seattle (the latter of which Orange Coast's counsel appears to have confused with Ocean Alexander Washington), Orange Coast asked, three days into trial, to have OAMYS substituted into the case in place of Ocean Alexander of Washington.

Judge Rodriguez was concerned about the confusing tangle of entities controlled by Ocean Alexander's owner Johnny Chueh: "[E]ntities are created like playing cards and they move back and forth." He was not impressed by the fact Prokorym had been verifying discovery responses on behalf of Ocean Alexander California, when Prokorym had just testified in court he had only been employed by OAMYS for the entire time. The judge concluded the defense had been less than forthcoming about which entities had been involved in the two transactions and expressed his displeasure with the defense's "gotcha" tactics. He pointed out that if Ocean Alexander of Washington thought it was not responsible for Prokorym's deals, it could have made a motion to get out of the case on that basis.

Counsel for the Alexander entities (that is, the Alexander entities *then* in the case, Ocean Alexander Washington and Ocean Alexander California) identified no prejudice from inclusion of OAMYS other than, of course, the loss of three days of trial time and the evaporation of an easy win derived from his adversary's inadvertence in suing the wrong Ocean Alexander entity. Most of counsel's argument (repeated in this appeal) is that given the number of exhibits that had "OAMYS" on them, plaintiff's

counsel should have known to include OAMYS from the beginning, and if he didn't . . . tough.

The motion to amend was granted, but Judge Rodriguez worked hard to ensure there would be no prejudice to OAMYS. He declared a mistrial so as to both allow the amendment and give the OAMYS entity time to prepare. A new trial was scheduled several months into the future in front of a new judge.[8] The actual amendment consisted merely of a form amendment to the complaint adding OAMYS as Doe 1; thus, Ocean Alexander of Washington remained in the case.

The new trial did not actually commence until October 2014. The new judge, Mary Fingal Schulte, heard all the evidence anew. She ruled in favor of two of the defendants, Ocean Alexander of Washington and Prokorym (as to the latter, the court found he was merely an employee of OAMYS). But she ruled against defendants OAMYS and its subsidiary Ocean Alexander California. She calculated the total amount owed (including interest) at $179,104.50 on the Halberda and Smith sales.[9] OAMYS and Ocean Alexander California have appealed.

### III.  DISCUSSION

A. *Statute of Limitations on the Halberda Sale*

1. *Two Years Versus Four*

The two Alexander appellants argue that the proper statute of limitations for this case is the two-year one for oral contracts (Code Civ. Proc., § 339[10]) as distinct from the four-year statute for written contracts (§ 337). Thus, the repudiation of the commission owing from the Halberda sale took place in February 2010, the action wasn't

---

[8] Given that the case against OAMYS was based on the same promises Prokorym had made to Orange Coast as were alleged in the complaint, and that OAMYS would end up being represented by the same counsel who had been representing Ocean Alexander Washington and Ocean Alexander California, we can see no prejudice to OAMYS. The trial judge was bending over sideways, if not backwards, to be fair to OAMYS.

[9] There is no issue on appeal as to the validity of the calculations, so we omit the constituent numbers.

[10] All further statutory references are to the Code of Civil Procedure.

9

filed until May 2012, and it is time-barred. We agree that the cause of action accrued in February 2010,[11] but we think it is governed by the four-year statute.

Exhibit 1 is a written "Dealer Commission Agreement" dated January 16, 2009, which refers to the sale of the 64-foot boat sold to Halberda, and directly acknowledges that there is not only a commission owed on the "Cash component of deal" but also a "Balance 6% of sale of 2008 47' Riviera." And it is signed as "approved" by "Ray" – the ubiquitous Prokorym. Indeed, exhibit 1, as shown by exhibit 6, was faxed over by Ray Prokorym to James McClaren on April 7, 2007, for McClaren to "sign and scan or fax back." And exhibit 7, an email two days later, mentions that "we" will pay "commission based on the net from" the sale of the "trade bot [*sic*]."

Exhibit 1 brings this case within the four-year statute. Cases involving the question of whether the two-year or the four-year statute governs often involve oral agreements with writings *not* signed by the defendant. And even those cases sometimes apply the four-year statute. (See *Pietrobon v. Libarle* (2006) 137 Cal.App.4th 992, 998 (*Pietrobon*) [applying four-year statute where defendant orally agreed in court to settlement later put in writing by defendant's attorney but not signed by defendant]; *E.O.C. Ord, Inc. v. Kovakovich* (1988) 200 Cal.App.3d 1194, 1202 (*Ord*) [applying four-year statute where defendant subsequently orally agreed with terms of letter sent by plaintiff]; accord, *James De Nicholas Associates, Inc. v. Heritage Constr. Corp.* (1970) 5 Cal.App.3d 421, 423-425 [applying two-year statute but only where all writings were prepared solely by plaintiff and there were no facts indicating defendant ever accepted the terms].) Here, the "writing" (exhibit 1) *was* signed by the defendants' agent, on Ocean Alexander stationery complete with Ocean Alexander logo, and was entitled a dealer "commission" agreement. *Pietrobon* and *Ord* apply a fortiori.

---

[11] The letter of Ocean Alexander stationary of February 25, 2010, is not susceptible to any other interpretation than as a repudiation of the contract to pay the commission. In effect it is a message from Ocean Alexander to Orange Coast that says: We don't owe you anything more on the Halberda deal, but remove your exclusive dealership claim and out of the kindness of our hearts we "may" give you a "courtesy payment."

10

The best the two Alexander appellants can do on the two-year versus four-year statute issue is to say that the two-year statute should govern because the relevant writing omits two material terms – namely (1) that the Riviera boat had to be sold in Orange Coast's territory and (2) that payment of the commission would only be due on the actual sale of that boat.[12]  In the context of this case, though, neither of those omissions are even remotely material.  As to (1), the argument misconstrues the essential contract:  The commission was owing on the total sale price of the new *Ocean Alexander* boat, and what was owing upon the event of the sale of the Riviera boat was only a *component* of *that* commission.  As to (2), the two Alexander appellants are confusing an accommodation made by Orange Coast to account for the delay in selling a trade-in with the essential terms of the basic commission agreement itself, namely 6 percent on the *total sale* price of the new Ocean Alexander boat.

Beyond the essential-term theory, the two Alexander appellants argue that paragraph 11 of Orange Coast's complaint is a binding judicial admission that the statute of limitations is the two-year one.  The argument is not persuasive because paragraph 11 does not say the agreement to pay a commission on the sale of the Riviera boat was only an oral one, subject to the two-year statute.  The pleading says the agreement was manifested "orally *and in emails* and pursuant to" a distributorship agreement.  (Italics added.)  That is hardly a judicial admission that agreement was *solely* an oral one.  As we have just seen, a defendant's oral agreement to a written contract (e.g., *Pietrobon*) comes within the four-year statute.  So does this case.

2. *Relation Back*

OAMYS argues that even if the four-year statute applies, its inclusion in 2014 via a Doe substitution does not, as a matter of law, relate back to the May 2012

---

12      The two Alexander appellants never actually mention exhibit 1 in their argument.  But since they do mention exhibit 6, and exhibit 6 had exhibit 1 as an attachment, we will assume they mean both exhibits 1 and 6.

11

original complaint. This argument, to allude to Judge Rodriguez's metaphor of shuffling cards, requires a little unpacking of the deck.

First of all, whether a motion to amend adding a defendant to an action relates back to an earlier complaint for purposes of the statute of limitations classically involves the same-general-set-of-facts test. (E.g., *Smeltzley v. Nicholson Mfg. Co.* (1977) 18 Cal.3d 932, 934 ["the California courts have established the rule that an amended complaint relates back to the filing of the original complaint, and thus avoids the bar of the statute of limitations, so long as recovery is sought in both pleadings on the same general set of facts"].) And OAMYS most certainly does not argue that OAMYS's liability here cannot be supported under the same general set of facts.

Second, adding a new defendant pursuant to section 473 is expressly a matter of trial court discretion.[13] Thus the standard of review on allowing amendments to pleadings is abuse of discretion (e.g., *Record v. Reason* (1999) 73 Cal.App.4th 472, 486) and the discretion is tested – significantly – against a backdrop of a policy that *favors* liberal allowance of amendments unless the opposing party is prejudiced (e.g., *Honig v. Financial Corp. of America* (1992) 6 Cal.App.4th 960, 965). We note again that OAMYS does not try to argue (at least directly) that Judge Rodriguez abused his discretion in granting Orange Coast's motion to add OAMYS to the complaint.

Rather, it appears that OAMYS theorizes that mere awareness of the existence of a party at the time of drafting the original complaint ipso facto precludes any

---

13      The statute's opening sentence is: "The court *may*, *in furtherance of justice*, and on any terms as may be proper, *allow a party to amend any pleading* or proceeding *by adding* or striking out *the name of any party*, or by correcting a mistake in the name of a party, or a mistake in any other respect; and may, upon like terms, enlarge the time for answer or demurrer." (§ 473, subd. (a)(1), italics added.)

12

relation back if that party is later substituted as a Doe defendant. Its authority for this proposition is *Taito v. Owens Corning* (1992) 7 Cal.App.4th 798, 802 (*Taito*).[14]

*Taito* began as a straight-forward personal injury action that got complicated when a workers' compensation carrier filed a complaint in intervention. In *Taito*, a bank security guard was allegedly beaten by the driver of a bulk commodities truck in January 1989. (*Taito, supra*, 7 Cal.App.4th at p. 800.) The original complaint, filed in July 1989, named the owner of the premises where the beating occurred (Owens Corning was the premises owner), the driver of the commodities truck individually, and several Does, but did not *name* the commodities company itself for whom the driver worked. (*Id.* at pp. 800-801.) However, the commodities company was served as Doe I in May 1990, and about three months later, in September 1990, the plaintiff formally amended its complaint to name the commodities company in place of Doe I. The commodities company then moved to dismiss the case based on its neither being named nor served within the then- one-year statute of limitations period. The *Taito* court observed, in later proceedings involving a workers' compensation insurers' complaint in intervention, that the Doe amendment could not relate back to the original complaint because the plaintiff *knew* that the commodities company was the truck drivers' employer at the time of the original beating. (*Id.* at p. 802.)

OAMYS overstates the rule about ignorance and Doe defendants, a rule which is itself a gloss on section 474, the Doe pleading statute.[15] As *Barnes v. Wilson*

_____

14      *Taito* began as a straight-forward personal injury action that got complicated when a workers' compensation carrier filed a complaint in intervention. For our purposes, here are the salient facts: a bank security guard was allegedly beaten by the driver of a bulk commodities truck in January 1989. (*Taito, supra*, 7 Cal.App.4th at p. 800.) The original complaint, filed in July 1989, named the owner of the premises where the beating occurred (Owens Corning was the premises owner), the driver of the commodities truck individually, and several Does, but did not *name* the commodities company itself for whom the driver worked. (*Id.* at pp. 800-801.) However, the commodities company was served as Doe I in May 1990, and about three months later, in September 1990, the plaintiff formally amended its complaint to name the commodities company in place of Doe I. The commodities company then moved to dismiss the case based on its neither being named nor served within the then- one-year statute of limitations period. The *Taito* court observed, in later proceedings involving a workers' compensation insurers' complaint in intervention, that the Doe amendment could not relate back to the original complaint because the plaintiff *knew* that the commodities company was the truck drivers' employer at the time of the original beating. (*Id.* at p. 802.)

13

(1974) 40 Cal.App.3d 199 has noted: "The phrase 'when the plaintiff is ignorant of the name of a defendant' in . . . section 474 *has not been interpreted literally*. The plaintiff is deemed 'ignorant of the name' if he knew the identity of the person *but was ignorant of facts giving him a cause of action against the person* [citations] . . . ." (*Id*. at p. 205, italics added.)

In the present case, there is substantial evidence that Orange Coast was indeed ignorant of the facts giving it a cause of action against OAMYS until February 2014. *Ray Prokorym himself did not know exactly for whom he was working until February 2014*. Moreover, the Ocean Alexander operation in Seattle appears to have deliberately tried to blur the edges of its various entities: Prokorym, for example, signed documents on behalf of Ocean Alexander generally (exhibit 1, signing as "store manager"), "Ocean Alexander Seattle WA" (exhibit 2), and Ocean Alexander California (exhibit 26, signing as authorized representative). If Ocean Alexander's own "store manager" could not penetrate the miasma of corporate entities floating around him, Orange Coast, a thousand miles away in Newport Beach, could hardly be expected to.

B. *Substantial Evidence Supporting a Commission on the Smith Sale*

The two Alexander appellants do not contest the existence of a finder's fee agreement made by Prokorym and Grayshock. Nor do they attempt any argument that Grayshock was not the procurer of Smith, the buyer of the new 78-foot boat. Rather, they merely argue that since it is undisputed that Grayshock did not actually negotiate the sale or complete the paperwork, as a matter of law no commission was owed.

The two Alexander appellants cite no authority for their argument. Their briefing is merely a compendium of things Grayshock didn't do, e.g., he didn't relay an offer from Smith to OAMYS. We reject the argument for two reasons:

---

15      As indicated, for example, by the *Taito* court's citation to section 474 after the words "the plaintiff must be genuinely ignorant of the defendant's identity or the facts rendering the defendant liable when the original complaint was filed." (See *Taito, supra*, 7 Cal.App.4th at p. 802.) Section 474 simply opens with the words "When the plaintiff is ignorant of the name of a defendant . . . ."

14

First, their argument runs counter to Grayshock's testimony that the deal he made with Prokorym did not require negotiation of the sale. Grayshock testified directly that the deal he made with Prokorym did not require negotiation of the actual purchase.

Second, the argument runs counter to case law which squarely holds that a salesperson cannot be cheated out of a commission by the unimaginative expedient of having him or her cut out of the actual negotiations once the salesperson has done the real work of actually finding a ready willing and able buyer. "[O]therwise, one might employ an agent to interview persons, and secure from them promises of contracts and then, by having another one 'close' the contracts, deny the agent the fruit of his labor." (*Brea v. McGlashan* (1934) 3 Cal.App.2d 454, 465) "[T]he rule is that if an agent (or broker) is the inducing or procuring cause of the contract, he is entitled to the commission, even though the principal takes it out of his own hand and completes it." (*Willson v. Turner Resilient Floors, Inc.* (1949) 89 Cal.App.2d 589, 596.) There is no question here that Grayshock did, indeed, find such a buyer for a boat in OAMY's inventory. He earned his commission.

IV. DISPOSITION

The judgment is affirmed. Orange Coast shall recover its costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


ARONSON, J.

15