Filed 1/14/25  Rosenthal v. Bella + Canvas CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JEFFREY ROSENTHAL, | B331769 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV42041) |
| v. | |
| BELLA + CANVAS, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rupert A. Byrdsong, Judge.  Reversed.

Grodsky, Olecki & Puritsky, Allen B. Grodsky, Tim B. Henderson for Plaintiff and Appellant.

Reed Smith, Raymond A. Cardozo; Bella + Canvas Legal Department, Andrew P. Holland, Cynthia C. Mullen for Defendants and Respondents Bella + Canvas and Daniel Harris.

Kinsella Holley Iser Kump Steinsapir, Jonathan P. Steinsapir, Suann C. MacIsaac and Shivani Morrison for

Defendants and Respondents Abby Gordon and Jeremy Schwartz.

_____

Bella + Canvas (Bella) is a clothing manufacturer.  In late March 2020, Bella determined it should begin manufacturing cloth face masks to meet the needs of the Covid-19 pandemic.  It entered into an oral agreement with Plaintiff Jeffrey Rosenthal, by which Rosenthal agreed to leverage his extensive personal and professional network to secure buyers for Bella's masks.  Rosenthal agreed to refer companies to purchase Bella's masks in exchange for a 10 percent commission on any sales.  After Rosenthal referred two companies to Bella, Starbucks and Target, Bella's principal, Daniel Harris, unilaterally modified the contract to reduce Rosenthal's commission on referrals to 1 or 2 percent.  Bella thereafter paid Rosenthal what it claimed he was owed under the modified agreement—this was far less than 10 percent of all sales generated by Starbucks and Target, among others.  Rosenthal filed this action against Bella and its principals, alleging breach of contract, fraud, and other counts.

Rosenthal now appeals from a judgment entered after the trial court sustained defendants' demurrers and granted motions for summary judgment.  Rosenthal argues the complaint stated viable causes of action and triable issues exist as to his claims.  We agree, and therefore reverse the judgment.

## BACKGROUND

The case comes to us after the trial court sustained demurrers and granted summary judgment.  To the extent facts relate to the demurrers, we take them from the pleadings, accepting them as true for purposes of review.  To the extent facts relate to summary judgment, we take them " 'from the record

2

that was before the trial court when it ruled on that motion.' " (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716-717 (*Wilson*).) In the summary judgment proceedings, most of the pertinent facts were undisputed.

At the onset of the Covid-19 pandemic in March 2020, Bella, a T-shirt manufacturer, transitioned to making cloth face masks that it intended to sell to large corporate employers and "consumer-facing" businesses. Harris was Bella's president and co-owner. Abby Gordon, a vice president of Bella's sister company, helped in Bella's transition effort.

Gordon knew Rosenthal through her husband Jeremy Schwartz, who was Rosenthal's business associate. Rosenthal had business contacts with large employers such as Starbucks, Amazon, Target, and Wal-Mart.

On March 21, 2020, in a telephone conversation among Schwartz, Rosenthal, and Gordon (speaking on Bella's behalf), Rosenthal agreed to introduce potential customers to Bella in exchange for a 10 percent commission on gross revenues from Bella's sales of face masks to those referred customers. There was no limitation on the time frame in which this commission would be payable. Harris confirmed the terms of the commission deal to Rosenthal and Schwartz shortly thereafter.

On March 23 and 24, 2020, Rosenthal referred Starbucks and Target to Bella for the purchase of face masks. Starbucks indicated by April 4 that it would place an order for face masks, and Target placed an order sometime later.

On April 5, 2020, Harris informed Rosenthal that Bella would not pay him a 10 percent commission.

Schwartz thereafter, without Rosenthal's authorization, negotiated a 1 percent commission with Bella on some orders and 2 percent on others.

Rosenthal continued to refer customers to Bella, and in May and June 2020 Bella paid him a total of $442,785.22.

Bella ultimately sold millions of masks to Starbucks and Target.

## A.     Complaints
### 1.     Original Complaint

In November 2020, Rosenthal sued Bella, Harris, and Gordon, asserting causes of action against Bella for promissory fraud, breach of contract, a common count, and unfair business practices under Business and Professions Code section 17200 et seq. (UCL), and against Harris and Gordon for fraud and violation of the UCL.

Rosenthal alleged his referrals to Bella resulted in over $55 million in mask sales, but defendants never intended to pay him the 10 percent commission they promised.  Instead, they intended to pay him only 1 or 2 percent commissions and informed him that even those were conditioned on Rosenthal paying Gordon a 10 percent "kickback."  Rosenthal alleged Harris informed him on April 5, 2020, that Bella would not pay 10 percent, and Schwartz thereafter secretly invoiced Bella at 1 and 2 percent rates and paid a 10 percent kickback to Gordon.

Defendants individually demurred to the complaint, arguing in part that Rosenthal lacked standing under the UCL because he was neither Bella's competitor nor a consumer.

The trial court ruled on Bella's and Harris's demurrers before briefing was complete on Gordon's demurrer.  The court overruled Bella's and Harris's demurrers to the causes of action for breach of contract, fraud and the common count, but

4

sustained the demurrers to the UCL claim without leave to amend.

Rosenthal filed his opposition to Gordon's demurrer after this ruling. In it, he declined to oppose the demurrer to his UCL claim, stating, inaccurately, that the demurrer was moot.

The court sustained Gordon's demurrer to the fraud cause of action with leave to amend, and her demurrer to the UCL claim without leave to amend.

### 2.     First Amended Complaint
In April 2021, Rosenthal filed a first amended complaint; the defendants individually answered.

### 3.     Second Amended Complaint
After conducting discovery, Rosenthal sought court approval to file a second amended complaint abandoning the promissory fraud claim against Gordon but including, among other new causes of action, a cause of action for conspiracy to commit fraud. In his application for leave to amend, Rosenthal represented that "the fraud on which the conspiracy claim is based . . . is Bella and Harris' fraud in the first [fraud] cause of action."

Rosenthal asserted two common counts and causes of action for fraud, breach of contract, conspiracy to commit fraud, inducing breach of contract, interfering with contract and with prospective economic relations, and breach of fiduciary duty.

In his cause of action for conspiracy to commit fraud, Rosenthal alleged that around the time Bella and Harris revealed their true intentions not to pay a 10 percent commission, they conspired with Gordon and Schwartz "to create the false

5

narrative that Rosenthal had agreed to modify his contract with [Bella] and agreed to take less than the 10% commission." Gordon and Schwartz continued to tell Rosenthal that he was entitled to a 10 percent commission, but they secretly agreed with Bella and Harris that Schwartz, who submitted invoices to Bella on Rosenthal's behalf, "would later take the position that he told Harris that he was authorized to negotiate on behalf of Rosenthal and that he and Rosenthal both agreed to accept . . . 2% for subsequent [Starbucks] orders and 1% on orders from Target." Defendants also "concocted [a] bogus term that commissions would be limited to masks sales within three months after April 5, 2020."

Rosenthal alleged that to reward Gordon and Schwartz for their part in the conspiracy, Bella secretly paid Gordon commissions on the sale of masks to Starbucks and Target, calculating that it would be less expensive to pay Gordon than Rosenthal.

Rosenthal alleged that he "did not authorize Schwartz to negotiate on his behalf and never agreed to accept a lower commission than the 10% promised by Harris and Gordon on behalf of [Bella]."

The second amended complaint also alleged a separate claim for fraud against Gordon and Schwartz—unrelated to the conspiracy theory—based on a "kickback" they represented Harris had said Rosenthal must pay to Gordon before Bella would pay him.

The second amended complaint asserted five additional, "alternative" claims against Schwartz, for inducing breach of contract, interfering with Rosenthal's contractual relations,

interfering with Rosenthal's prospective economic relationship, breach of fiduciary duty, and money had and received.

Rosenthal alleged that after Bella informed him it would not pay a 10 percent commission and, in fact, had no obligation to pay anything, Schwartz, to secure "financial benefits for himself and his wife," reassured Bella that Rosenthal would accept a 2 percent commission. As a result, Bella refused to pay Rosenthal per the March 2020 agreement.

In his cause of action for breach of fiduciary duty against Schwartz, Rosenthal alleged that "while Rosenthal denies he was in a partnership with Schwartz, to the extent it is found or determined that Rosenthal and Schwartz were partners or owed each other fiduciary duties, then . . . Schwartz breached his fiduciary duty to Rosenthal."

In his common count against Schwartz, Rosenthal alleged that although he agreed to share 10 percent of his commissions with Gordon, with 45 percent going each to himself and Schwartz, Schwartz deducted and kept an additional 5 percent from Rosenthal's share, and kept Gordon's share, resulting in Schwartz receiving 60 percent of the commissions and Rosenthal only 40 percent.

Bella and Harris jointly demurred to Rosenthal's cause of action for conspiracy to defraud, the only new cause of action against them. The court sustained the demurrer without leave to amend.

Gordon and Schwartz also jointly demurred. The court sustained the demurrer without leave to amend as to Rosenthal's cause of action for conspiracy to commit fraud, as to the interference and breach of fiduciary duty claims against Schwartz, and as to the common count. The court sustained the

demurrer *with* leave to amend on the fraud claim against Gordon and Schwartz based on the alleged kickback to Gordon.

### 4. Third Amended Complaint

In July 2022, Rosenthal filed his operative third amended complaint asserting causes of action against Bella and Harris for fraud, breach of contract, and a common count for services rendered (the same claims as had been alleged in the first amended complaint), and against Gordon and Schwartz for fraud based on the kickback scheme.

Rosenthal alleged that on March 21, 2020, and the following week, Bella—through both Gordon and Harris in separate telephone conversations—agreed to pay him a 10 percent commission "on the gross revenue earned from any purchasers introduced by either Rosenthal or Schwartz." The agreement specified no time by which a purchaser had to place an order and placed no limitation on when the commissions would be payable. Rosenthal alleged that on March 23, 2020, he recommended Bella masks to the founder of Starbucks, and later referred Target, Lyft, Uber, U.S. Merchandise, Inc., the U.S. Department of State, and other companies and public entities.

Rosenthal alleged that on April 5, 2020, after he had contacted numerous potential customers on Bella's behalf, and after Starbucks had ordered more than 7 million masks, Harris informed him that Bella had no obligation to pay him anything. Rosenthal alleged that Bella sold millions of masks to entities he referred to Bella, not including Starbucks, yet paid him no commissions on these sales. He asserted in his common count for services rendered that Bella owed him the reasonable value of his services.

8

Rosenthal alleged that Gordon and Schwartz fraudulently induced him to pay Gordon 10 percent of commissions received from Bella, and intended by their representations "to induce Rosenthal to introduce his contacts to Bella + Canvas and to encourage those contacts to purchase only from Bella + Canvas."

Rosenthal sought damages according to proof, injunctive relief, punitive damages, and such other relief as the court deemed just.

Defendants answered the complaint with general denials and affirmative defenses including, on Schwartz's part, the defenses of "authorization" and "estoppel."

## B.    Summary Judgment
### 1.    Bella and Harris's Motion

In January 2023, Bella and Harris moved for summary judgment, supporting the motion exclusively with Rosenthal's discovery responses.

#### a.    Contract Claim

With respect to Rosenthal's cause of action for breach of contract, Bella and Harris argued only that Rosenthal could not establish the existence of a contract. They admitted that Rosenthal performed under the March 2020 agreement, and further admitted that Bella refused to pay Rosenthal 10 percent on all commissions.

Bella and Harris argued that Rosenthal could not establish the existence of a contract because the March 2020 agreement, upon which his claims were based, had been terminated before any sales occurred.

9

For purposes of summary judgment only, Bella and Harris admitted in their separate statement of undisputed material facts that in March 2020, Bella "agreed that [Rosenthal] would introduce potential customers of face masks to [Bella] in exchange for a 10% commission on gross revenues from [Bella's] sales to those referred customers. There was no limitation on the time frame in which this commission would be payable."

Bella and Harris cited as evidence supporting this admission Rosenthal's response to their first set of form interrogatories, Response No. 50.1, which Bella and Harris quoted almost verbatim.

Bella and Harris also admitted that Rosenthal performed under the agreement by referring customers to Bella. They supported this admission with: (1) Rosenthal's discovery responses indicating he made referrals to Bella, which paid him $275,104.02 on May 18, 2020, and $167,681.20 on June 19, 2020; and (2) a proposed April 4, 2020 invoice sent to a Starbucks representative indicating that by April 4, Starbucks had stated it would order face masks from Bella.

Bella and Harris did not deny that they failed to perform under the agreement, but instead argued the agreement was terminable at will, and Harris either modified or terminated it on April 5, 2020.

In support of the argument, Bella and Harris presented evidence—again, Rosenthal's discovery responses—that on April 5, 2020, Harris informed Rosenthal that Bella "would not be paying a 10% commission on all customers introduced by [Rosenthal]. On the call, Harris told [Rosenthal] that [Bella] would pay him 10% on the first order from Starbucks." Bella and Harris argued that by April 5, 2020, no referred customer other

10

than Starbucks had submitted a purchase order to Bella. They cited no evidence supporting the argument, but it appears to be undisputed.

Bella and Harris argued that on April 5, 2020, Harris informed Rosenthal that Bella would pay 10 percent only on orders close to closing, i.e., the first order from Starbucks. For all other orders going forward the commission would be 1 percent on orders from Target and 2 percent on other orders. Bella and Harris argued that Rosenthal continued performing under these new terms, which terminated the March agreement and created a new agreement.

### b.    Fraud and Punitive Damages Claims

Bella and Harris moved for summary judgment on Rosenthal's fraud and punitive damages claims on the sole ground that Rosenthal suffered no cognizable fraud damages. This is so, they argued, because he incurred no out-of-pocket damages in that he "did not expend money or lose anything of value that he possessed prior to the fraud."

They supported the motion with Rosenthal's discovery response to Form Interrogatory No. 9.1. Form Interrogatory No. 9.1, asked, "Are there any . . . damages that you attribute to the INCIDENT? If so, for each item of damage state: . . . [¶] . . . the nature." Among other things, Rosenthal stated in response: (1) he was damaged "in the amount of the reasonable values of [his] services"; (2) he was entitled to restitution; and (3) he "could have introduced his contacts to other manufacturers of face masks but, because of the Defendants' fraud, went with Defendants. [He] would have made more in commissions had he not been defrauded by Defendants." Bella and Harris argued that these responses constituted an admission that Rosenthal "did not

11

expend money or lose anything of value that he possessed prior to the fraud," and instead sought only "benefit-of-the-bargain" damages, which under California law are not compensable in tort. Bella and Harris did not address Rosenthal's response that he "could have introduced his contacts to other manufacturers of face masks but, because of the Defendants' fraud, went with Defendants."

### 2.     Rosenthal's Opposition

In opposition to the motion, Rosenthal objected that portions of the declaration of Cynthia C. Mellen, Bella's and Harris's counsel, constituted hearsay and lacked foundation. Specifically, the objections were to Exhibits: H (April 5, 2020 email from Gordon regarding a Starbucks referral and an April 4, 2020 proforma invoice); K (April 10, 2020 email from Gordon regarding a City of New York referral); and L (April 14, 2020 email from Gordon regarding the New York City referral).   The court did not rule on these objections.

Rosenthal declared that on March 23 and 24, 2020, he recommended Bella's masks to the founder of Starbucks and to a representative from Target.  Both companies ultimately placed orders with Bella.  Rosenthal argued he sought contract damages only as to masks sold to Starbucks and Target, the customers he referred to Bella before April 5, 2020.

Observing that defendants' motion focused on "one minor element of fraud damages," Rosenthal admitted that if he could not prove "the amounts spent in reliance on fraud" he would be entitled to no damages at all.  Quoting *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1240 (*Alliance*), Rosenthal argued that his fraud damages constituted the difference between the fair market value of what he gave to Bella and the value of

what he received.  Defendants' motion did not address the lost opportunity claim Rosenthal raised in response to Form Interrogatory No. 9.1, and he did not in his opposition explicitly mention this claim.  However, as evidence of his damages he cited pages 7 to 10 of his response to Form Interrogatory 9.1, where he had made the claim.  Rosenthal argued that the definition of "harm" caused by fraud was far broader than defendants' motion suggested.  He cited, among other things, *Alliance, supra*, and *Sutter v. General Petroleum Corp*. (1946) 28 Cal.2d 525 (*Sutter*) in support of this argument.

Rosenthal declared that based on his personal experience, the fair market value of his referral services was 8 to 12 percent of the gross revenues of sales to referred customers.  He provided expert testimony to similar effect.  Rosenthal declared that when Harris told him on April 5, 2020 that he would not be paid 10 percent in commissions, he told Harris he did not agree to the lower amount.  He admitted, however, that he received approximately $440,000 from Bella in May and June 2020.

### 3. Reply

In their reply, Bella and Harris admitted that "to the extent that Plaintiff had already performed, i.e., for referred face mask orders already placed, he would receive the original 10% commission. . . .  But going forward, i.e., for orders placed after April 6, 2020, the commission would be reduced."

### 4. Ruling

On May 9, 2023, the court granted Bella's and Harris's motion for summary judgment, which, after its demurrer rulings, *ante*, left the fraud claim against Gordon and Schwartz as the sole remaining claim in the case.

13

## C.    Dismissal

After summary judgment for Bella and Harris, plaintiff dismissed the fraud cause of action against Gordon and Schwartz without prejudice and applied for entry of judgment.

Rosenthal appeals from the resulting judgment.

## DISCUSSION

## A.    Rosenthal's Appeal of Rulings as to Bella and Harris

In his appeal of the judgment in favor of Bella and Harris, Rosenthal contends summary judgment was improper as to his breach of contract claim because the claim arises from his performance before Harris terminated the March 2020 agreement.  He argues that triable issues exist as to whether Bella and Harris breached the pre-modification agreement.

Rosenthal contends summary judgment was improper as to his fraud claim because Bella and Harris failed to negate the damages element, which Rosenthal sometimes argues is the difference between the fair market values of what he "gave up" and what he received, and sometimes argues is the difference between the values of what he "gave" and what he received.

Rosenthal contends the court erroneously sustained Bella and Harris's demurrer to his UCL claim in the original complaint, and to his cause of action for conspiracy to defraud in the second amended complaint.

### 1.    Summary Judgment

A trial court properly grants summary judgment " 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'  (Code Civ. Proc., § 437c, subd. (c).)  A

14

defendant may establish its right to summary judgment by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to the cause of action. ([§] 437c, subd. (p)(2).)' " (*Neiman v. Leo A. Daly Co.* (2012) 210 Cal.App.4th 962, 967.) "Once the moving defendant has satisfied its burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to each cause of action. [Citation.] A triable issue of material fact exists where 'the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Ibid.*)

In reviewing an order granting a motion for summary adjudication, we apply the same de novo standard of review that applies to the granting of summary judgments. (*Smith v. Wells Fargo Bank, N.A.* (2005) 135 Cal.App.4th 1463, 1471.) We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained. (*Wilson*, *supra*, 42 Cal.4th at pp. 716-717.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Id.* at p. 717.) We accept as true the facts shown by the evidence offered in opposition to summary judgment and the reasonable inferences that can be drawn from them. (*Spitzer v. The Good Guys, Inc.* (2000) 80 Cal.App.4th 1376, 1385-1386.)

### a.     Breach of Contract

Bella and Harris challenged Rosenthal's breach of contract cause of action on the ground that Rosenthal's claims were premised on a terminated agreement. Rosenthal contended below and maintains on appeal that his claims are premised on sales to customers referred prior to termination of the agreement.

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)

"The interpretation of a contract is a judicial function. [Citation.] In engaging in this function, the trial court 'give[s] effect to the mutual intention of the parties as it existed' at the time the contract was executed. [Citation.] Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms." (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-1126.)

As admitted in Bella and Harris's separate statement of undisputed material facts, the March 2020 agreement obligated Bella to pay a 10 percent commission on gross revenues from sales to customers Rosenthal "introduced" to Bella. There was no limitation on the time frame in which those sales had to occur or in which the commission would be payable. In other words, the agreement did not provide that Bella would pay 10 percent only on sales occurring within a certain time frame. Bella and Harris also admitted Rosenthal performed under the contract by making at least one referral, to Starbucks.

We will assume for purposes of argument that the March 2020 commissions contract was terminable at will, which Rosenthal does not contest for purposes of summary judgment. We will also assume Harris terminated the contract on April 5, 2020. We make these assumptions because the contract's terminability is tangential to this analysis. If the contract was not terminable, then triable issues exist as to whether Bella and Harris breached the contract. If the contract was terminable, triable issues exist as to whether Bella and Harris breached the

16

contract as to Rosenthal's pre-termination performance, as we will discuss.

Assuming the agreement was terminated on April 5, 2020, after Rosenthal referred Starbucks and Target to Bella, termination would operate only prospectively. Termination "occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach. On 'termination' all obligations which are still executory on both sides are discharged but any right based on prior breach or performance survives." (Com. Code, § 2106; see *Grant v. Aerodraulics Co.* (1949) 91 Cal.App.2d 68, 75 ["To 'terminate' a contract . . . means to abrogate so much of it as remains unperformed, thereby doing away with the existing agreement upon the terms and with the consequences agreed upon"].)

Thus, when a terminated contract concerns severable services, the plaintiff may still recover for services performed before the termination of the relationship. (*Zinn v. Ex-Cell-O Corp.* (1944) 24 Cal.2d 290, 296.) Specifically, " '[i]f the contract contemplates that the agent shall receive compensation for sales of which the agent was the procuring cause, the agent is entitled to a commission on sales procured by him although the sales were actually consummated by the principal after the termination of the agency.' " (*Ibid.*; see also *Wise v. Reeve Electronics, Inc.* (1960) 183 Cal.App.2d 4, 12-13 [oral agreement that plaintiff would receive commission on "all products of defendant sold," with no provision regarding plaintiff's pre-termination solicitations of orders taken after termination].)

A person is considered the procuring cause of a transaction " 'if he brings the principal and the purchaser together so that they may enter into such a contract. In other words, if the broker's efforts result in a "meeting of the minds" between the

17

buyer and the seller but the final negotiations and the conclusion of the sale are conducted by them without the aid of the broker, he will still earn his commission.' " (*Buckaloo v. Johnson* (1975) 14 Cal.3d 815, 820-821, fn. 2 (*Buckaloo*), disapproved on other grounds in *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 393, fn. 5; see also *Willson v. Turner Resilient Floors, Inc.* (1949) 89 Cal.App.2d 589, 596 (*Willson*) [" 'An agent is an "effective cause" ' " of a result " 'when his efforts have been sufficiently important in achieving a result for the accomplishment of which the principal has promised to pay him so that it is just that the principal should pay the promised compensation to him' "]; *Brea v. McGlashan* (1934) 3 Cal.App.2d 454, 465 ["if an agent (or broker) is the inducing or procuring cause of the contract, he is entitled to the commission, even though the principal takes it out of his own hand and completes it.  The originating cause which ultimately led to the conclusion of the transaction, is held to be the procuring cause"].)

" 'Whether the broker was the "procuring cause" and the "motivating force" of the sale is a question of fact to be determined from all of the circumstances surrounding each specific case.' " (*Buckaloo*, *supra*, 14 Cal.3d at pp. 820-821, fn. 2; see also *Willson*, *supra*, 89 Cal.App.2d at p. 596 ["the test is one of 'fairness,' and the question is one of fact for the jury"].)  Bella and Harris contend (and Rosenthal does not dispute) that the March 2020 agreement was terminated or modified on April 5, 2020.  Their motion, however, did not address the fact that Rosenthal performed under the agreement before April 5, 2020, by referring customers to Bella.  The motion addressed only when *orders and sales* to referred customers occurred.  But the timing of orders and sales is not dispositive here because the agreement contained no provision concerning when orders or sales had to occur to earn the commission.  The key question was whether

18

Rosenthal made *referrals* before or after contract termination. Bella and Harris's own evidence illustrated that he did make referrals prior to contract termination.

Bella and Harris admitted, by offering an April 4, 2020 proforma invoice to Starbucks, that Rosenthal referred Starbucks to Bella before April 5, 2020. They also admitted that on April 5, Harris informed Rosenthal that Bella "would not be paying a 10% commission on all customers introduced by" Rosenthal and would pay 10 percent only "on the first order from Starbucks." But the agreement contained no "first order" limitation. Because of these admissions, a triable issue existed as to whether Harris breached the agreement by repudiating Bella's promise to pay a 10 percent commission on *all* "sales" (as opposed to only the *first* sale) to Starbucks. (See *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 489 (*Romano*) ["if a party to a contract expressly or by implication repudiates the contract before the time for his or her performance has arrived, an anticipatory breach is said to have occurred"].)

By addressing only the tangential issue of when orders and sales occurred, and failing to address the key issue of whether referrals occurred before the April 5, 2020 termination, Bella and Harris failed to show that one or more elements of Rosenthal's cause of action for breach of contract could not be established. They therefore failed to meet their initial burden to demonstrate entitlement to judgment as a matter of law. The court need not have reached Rosenthal's opposition.

Bella and Harris argue that because Rosenthal continued to refer customers to Bella after April 5, 2020, he agreed to the new commission terms retroactively as a matter of law. We disagree.

As noted above, termination of a contract operates only prospectively unless the parties agree otherwise. (*Zinn, supra,*

19

24 Cal.2d at p. 296.) No authority to which we have been directed provides that as a matter of law, continued performance after contract termination constitutes agreement to the new terms retroactive to pre-termination performance. Here, construing all evidence and inferences in Rosenthal's favor, we have no basis to conclude anything other than that Rosenthal's continued performance evidenced his acceptance of the modified terms prospectively to reduce commissions on new referrals. Bella and Harris adduced no evidence to the contrary.

Bella and Harris cite five cases—*Klein Norton Co. v. Cohen* (1930) 107 Cal.App. 325, 327-328 (*Klein*); *Burcham v. Caprio* (1949) 94 Cal.App.2d 514, 516-517; *Swalley v. Addressograph Multigraph Corp.* (7th Cir. 1946) 158 F.2d 51, 54; *DiGiacinto v. Ameriko-Omserv Corp.* (1997) 59 Cal.App.4th 629, 637 (*DiGiacinto*); and *Schachter v. Citigroup, Inc.* (2009) 47 Cal.4th 610, 620 (*Schachter*)—for the proposition that to preserve a claim founded on pre-modification performance, a party must "refuse[] to perform further" after modification.

These cases do not so hold, nor have Bella and Harris meaningfully analyzed this issue.

For example, in *Klein*, *supra*, the parties entered into a written contract by which Cohen, a salesman, would receive a 3 percent commission on sales he made on behalf of Klein Norton Company. The agreement was for an indefinite time and could be terminated at any time. (*Klein*, *supra*, 107 Cal.App. at p. 327.) Klein Norton asserted that sometime after entering into the agreement, it informed Cohen that going forward, commissions would be reduced. (*Id.* at pp. 328-329.) The reviewing court held that by informing Cohen of the reduction, Klein Norton made a new offer that Cohen accepted, which terminated the written agreement. The court held that "the oral agreement made by the parties was not, as contemplated by law, executed. . . . [T]he

20

reciprocal obligations of the parties—the selling of the merchandise by [Cohen] and the payment therefor by [Klein Norton]—had not been performed. They were, on both sides, to be performed in the future." (*Id*. at pp. 330-331.) Nothing in the opinion suggests the reduced commission under the new agreement applied retroactively to sales made under the prior agreement.

In *DiGiacinto*, *supra*, an employer unilaterally modified an employment agreement to reduce the employee's hourly wage. The employee continued to work for a year, then sued to recover wages for that year at the original rate. (*DiGiacinto*, *supra*, 59 Cal.App.4th at p. 632.) The court had no occasion to address the amount due the employee for work performed before the employer modified the contract.

In *Schachter*, *supra*, an employer and employee bilaterally modified an employment agreement prospectively. The Court held, "[a]n 'employee who continues in the employ of the employer after the employer has given notice of changed terms or conditions of employment has accepted the changed terms and conditions.' " (*Schachter*, *supra*, 47 Cal.4th at p. 620.) "[E]mployers and employees are free to *prospectively* and *bilaterally* alter the terms of employment." (*Ibid*., original italics.)

None of these cases supports the proposition that Bella could unilaterally reduce Rosenthal's compensation for services he performed before Bella claims to have terminated the March 2020 agreement. Nor do the other cases cited support this proposition. When a party asserts a point but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

21

We conclude that Bella and Harris failed to satisfy their burden to show that Rosenthal's claims are based on a terminated contract.

Even had they done so, and thus shifted the burden to Rosenthal to demonstrate a triable issue, Rosenthal declared in opposition to the motion that he referred both Starbucks and Target to Bella before April 5, 2020, and asserted that he sought contract damages only as to sales to these customers. Defendants offered no rebuttal to this evidence. This undisputed evidence would have established a triable issue of material fact.

In sum, triable issues exist as to whether Rosenthal's breach of contract claim is premised on a terminated agreement, either because Bella and Harris's motion ignored Rosenthal's pre-termination performance claim or because Rosenthal offered affirmative evidence establishing performance. Summary judgment on Rosenthal's cause of action for breach of contract was improper.

### b. Common Count

Rosenthal alleges in his common count that Bella and Harris requested but did not pay him for the reasonable value of his referral services. Bella and Harris made no independent showing on this count below—their separate statement set forth identical facts and evidence for both Rosenthal's contract and common count claims. And on appeal, Bella and Harris argue only that the common count fails for the same reason that Rosenthal failed to raise a triable issue on his breach of contract claim. By that token, and because we hold, at the very least, a triable issue exists as to Rosenthal's contract claim, a triable issue exists also as to the common count.

### c.  Fraud

Bella and Harris challenged only the damages element of Rosenthal's fraud cause of action.  They contended there were no triable issues of material fact because Rosenthal lost nothing of value "that he possessed" in reliance on Bella and Harris's representation that Bella intended to pay Rosenthal for referrals.  Instead, Bella and Harris argued, Rosenthal sought only benefit-of-the-bargain damages, which are recoverable only on a contract claim, not a fraud claim.

Rosenthal argues Bella and Harris ignored his response to Form Interrogatory No. 9.1, that he suffered damages because, due to their fraud, he "did not seek to represent other customers."  We agree.

" 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.]  [¶] 'Promissory fraud' is a subspecies of the action for fraud and deceit.  A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.  [Citations.]  [¶]  An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (*Lazar*).)

"For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333; see also Civ. Code, § 1709 ["One who willfully deceives another with intent to

23

induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers"].)

Although the measure of damages is intended to compensate a plaintiff for a loss sustained, plaintiff is not entitled to tort damages that would "give him the benefit of any contract bargain." (*Overgaard v. Johnson* (1977) 68 Cal.App.3d 821, 823-824.)

"The 'out-of-pocket' measure of damages 'is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received. The "benefit-of-the-bargain" measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive.' " (*Alliance, supra,* 10 Cal.4th at p. 1240.)

Out-of-pocket damage has two elements. First, the plaintiff must have given up or lost possession of something as a result of the defendant's fraud. (See *Alliance, supra,* 10 Cal.4th at p. 1240 ["unless the plaintiff merely seeks to rescind the contract, it must suffer actual monetary loss to recover on a fraud claim"].) Second, the plaintiff must be able to place a monetary value on that which he lost.

In *Lazar,* for example, the plaintiff alleged he was induced to leave a secure job and relocate from New York to California based on false representations that the California company was financially strong and the plaintiff would have long-term employment. (*Lazar, supra,* 12 Cal.4th at p. 636.) The plaintiff was terminated two years later. (*Ibid.*) The Supreme Court held

24

that fraud damages could not include prospective loss of income associated with the California job, i.e., the plaintiff's expectancy interest in contract fulfillment, but could include consequential damages such as "the loss of security and income associated with his former employment in New York." (*Id*. at pp. 648-649.)

In *Sutter, supra,* 28 Cal.2d 525, the plaintiff, Sutter, was induced by false promises to abandon his own oil development projects and devote his time and efforts to developing and carrying out the defendants' project. (*Id*. at pp. 530-531.) Sutter sought reimbursement of the reasonable value of his services during the time he was engaged in developing and operating the defendants' project. (*Id*. at p. 534.) The Court held he adequately pleaded entitlement to "the reasonable value of his services and the loss of [his] time." (*Id*. at p. 535.)

*Lazar* and *Sutter* thus held that a fraud plaintiff may seek compensation for out-of-pocket damages, including lost opportunities.

Here, when asked to identify his damages, Rosenthal, stated he "could have introduced his contacts to other manufacturers of face masks but, because of the Defendants' fraud, went with Defendants." Pursuant to *Alliance*, *Lazar,* and *Sutter*, this lost opportunity, along with whatever money or time Rosenthal lost as a result of Bella's and Harris's fraud, constitutes out-of-pocket damages compensable in fraud.

Bella's and Harris's motion ignored this issue. They asserted only that Rosenthal had no evidence that he spent or lost money as a result of the fraud, ignoring his lost opportunity claim. Their respondents' brief on appeal does not mention the word *opportunity*. Bella's and Harris's first effort to address Rosenthal's lost opportunity theory occurred at oral argument, in which their counsel stated Rosenthal could recover only for the opportunity he "forewent," and then incorrectly asserted that

25

Rosenthal offered no evidence of any lost opportunity. But as explained above, Rosenthal made the claim in his discovery response and referenced the discovery response in his opposition to summary judgment. In any event, because Bella's and Harris's motion ignored this issue in the first instance, we conclude summary judgment on Rosenthal's fraud claim would have been improper on this ground even absent an opposition. (See Code Civ. Proc., § 437c, subd. (f)(1) ["A motion for summary adjudication shall be granted only if it completely disposes of a cause of action"].)

Bella and Harris argue they were not required to negate every conceivable theory of fraud damages; they were required to negate the only legal theory that Rosenthal asserted below. We agree, but they failed to negate Rosenthal's lost opportunity theory, which he asserted both in his third amended complaint and discovery responses.

Bella and Harris argue that Rosenthal's proposed damages theory would permit him to both accept the modified terms of the agreement and also sue for fraud damages alleging the value of his services exceeded the terms of the modified agreement. For reasons discussed above, we disagree. Rosenthal's fraud claim pertains only to referrals he made before the alleged contract modification, not after. Rosenthal also may not recover the same damages both in fraud and contract. Any overlap between damages recoverable in tort and contract would be limited by the rule against double recovery. (*Lazar*, *supra*, 12 Cal.4th at pp. 648-649.) Defendants argue that Rosenthal's claim for punitive damages fails with his fraud claim. Because we conclude triable issues of material fact exist as to the fraud claim, they exist too as to the punitive damages claim.

We conclude summary judgment was improper as to Bella and Harris.

## 2.     Demurrer

Rosenthal contends the trial court erred in sustaining Bella and Harris's demurrer to his UCL cause of action in the original complaint, and to his cause of action for conspiracy to defraud in the second amended complaint.  We agree.

### a.     UCL

The UCL defines unfair competition as "any unlawful, unfair or fraudulent business act or practice."  (Bus. & Prof. Code, § 17200.)  Therefore, under the statute "there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent."  (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311 (*Tobacco II*).)

Under the fraud prong, "a plaintiff must allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct."  (*Tobacco II*, *supra*, 46 Cal.4th at p. 328.)

An "unfair" business practice occurs when that practice " 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' "  (*State Farm Fire & Casualty Co. v. Superior Court* (1996) 45 Cal.App.4th 1093, 1104.)  The "unfair" standard "is intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud.  [Citation.]  The test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer.  In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim' "  (*Id*. at pp. 1103-1104.)

On appeal from a judgment after an order sustaining a demurrer, we review the order de novo to determine whether the

27

complaint states a cause of action.  (See *McMahon v. Craig* (2009) 176 Cal.App.4th 1502, 1508-1509.)

Here, Rosenthal alleged that Bella, Harris, and Gordon colluded to defraud him of most of his commissions, to invoice Bella at the reduced rate without his knowledge, and to kick back 10 percent of his reduced commission to Gordon.  These allegations set forth a fraudulent and unfair practice and Rosenthal's economic injury; the demurrer to Rosenthal's UCL cause of action should have been overruled.

Bella and Harris argue that standing to sue under the UCL is confined to competitors and consumers because the UCL is intended to preserve fair competition and protect consumers from market distortions (see *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 187 (*Cel-Tech*)), and not to create a redundant and unnecessary cause of action for commercial parties who are capable of bringing their own claims for breach of contract or in tort (see *Linear Technology Corp. v. Applied Materials, Inc.* (2007) 152 Cal.App.4th 115, 135-136 (*Linear Technology*)).  We disagree.

A private person has standing to sue under the UCL if he or she "has suffered injury in fact and has lost money or property as a result of . . . unfair competition."  (Bus. & Prof. Code, § 17204; *Kwikset Corp. v. Superior Ct.* (2011) 51 Cal.4th 310, 322.)  Proof of economic injury from unfair competition can be shown by demonstrating that a plaintiff was "deprived of money or property to which he or she has a cognizable claim."  (*Kwikset*, at p. 323.)

Rosenthal's allegations that he lost commissions to which he had a contractual claim establish standing for purposes of demurrer.

No authority to which we have been directed abrogates the standing provision of Business and Professions Code section

28

17204 simply because the plaintiff is a sophisticated businessman.

*Linear Technology*, upon which Bella and Harris principally rely, held that "where a UCL action is based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks." (*Linear Technology*, *supra*, 152 Cal.App.4th at p. 135.) It is unclear how this logic would apply here.

Bella and Harris argue that because Rosenthal is a sophisticated party with business experience, he is subject to the limitations described in *Linear Technology*. We disagree. *Linear Technology* itself did not so hold, and nothing in the UCL's standing provision, Business and Professions Code section 17204, limits its grant of standing to "a person" who is unsophisticated.

Bella and Harris argue that Rosenthal's UCL claim merely restated his fraud claim, and thus sustaining the demurrer to the claim was nonprejudicial. We disagree. Rosenthal's fraud and UCL claims are not duplicative, because he alleges that the UCL claim is founded on both fraudulent *and* unfair conduct, e.g., the kickback scheme and breach of contract, whereas the fraud claim is based only on Bella and Harris's misrepresentations and false promises.

Bella and Harris argue Rosenthal lacks standing under the UCL because he insists on a benefit-of-the-bargain measure of damages and is not seeking out-of-pocket damages. For reasons discussed above, we disagree.

### b.      Conspiracy to Defraud

In his cause of action for conspiracy to commit fraud, Rosenthal alleged that Bella and Harris conspired with Gordon and Schwartz not only to limit his commissions to 1 or 2 percent

of sales but to restrict those commissions to sales occurring withing within three months after April 5, 2020.

Bella and Harris do not dispute that these allegations on their face state a cause of action for conspiracy to defraud. Instead, Bella and Harris argue that because Rosenthal admitted in his application for leave to amend that "the fraud on which the conspiracy claim is based . . . is Bella and Harris' fraud in the first cause of action," the cause of action fails because a party cannot conspire with itself. We disagree with this reading of the operative complaint.

Conspiracy is a theory of vicarious liability by which one defendant can be held liable for the acts of another. (*IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 652.) Because conspiracy is not itself a tort, "[i]t must be activated by the commission of an actual tort." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 511.)

As noted above, Rosenthal alleges several elements of a fraudulent scheme among Bella, Harris, Gordon, and Schwartz in addition to the promissory fraud alleged in the fraud cause of action. For example, in the fraud cause of action, Rosenthal alleges that Bella and Harris conspired with Gordon and Schwartz to limit Rosenthal's commissions to 1 or 2 percent of sales, and to limit sales upon which commissions would be based to within three months after April 5, 2020.

Bella and Harris's demurrer to the cause of action for conspiracy to defraud should have been overruled.

30

**B. Rosenthal's Appeal as to Rulings in Favor of Gordon and Schwartz**

In his appeal of the judgment in favor of Gordon and Schwartz, Rosenthal contends the trial court erred in sustaining demurrers without leave to amend. We agree.

Although judgment was entered in favor of Gordon and Schwartz only after Rosenthal dismissed a viable cause of action against them, presumably to facilitate appeal, a plaintiff who dismisses a complaint after an adverse ruling by the trial court may still appeal the adverse ruling insofar as other limitations on appealability permit. (*Gutkin v. Univ. of S. Cal.* (2002) 101 Cal.App.4th 967, 974-975.)

**1. Original Complaint**

As discussed above, the court incorrectly sustained Bella and Harris's demurrer to Rosenthal's UCL Claim. The same goes for Gordon's and Schwartz's demurrer to that claim.

Citing *Roman v. BRE Properties, Inc.* (2015) 237 Cal.App.4th 1040, 1056 (*Roman*), Gordon and Schwartz argue that Rosenthal waived or forfeited his appeal of this ruling by failing to oppose their demurrer. *Roman* is inapposite. There, an appellant contended that summary judgment was improper because more discovery was needed. But the appellant failed to ask for a continuance of summary judgment proceedings to conduct more discovery. The court held that a party who fails to request such a continuance cannot complain on appeal that the need for discovery precluded summary judgment. *Roman* said nothing about whether a plaintiff may appeal a judgment entered after an unopposed demurrer is sustained.

### 2. Second Amended Complaint
### a. Conspiracy to Defraud

As discussed above regarding Bella and Harris's demurrer, Rosenthal's second amended complaint adequately stated a cause of action for conspiracy to defraud. The same reasoning applies to Gordon's and Schwartz's demurrer.

Gordon and Schwartz argue the conspiracy claim fails because Rosenthal alleges that their part in the conspiracy—their creation of a false narrative that Rosenthal would accept a 1 or 2 percent commission rather than 10 percent, did not occur until after the fraud, i.e., until Harris's statement on April 5, 2020 that Bella would not pay 10 percent. We disagree, because Bella and Harris's fraud was not complete until they made good on their threat not to pay 10 percent.

As noted above, "In the event the promisor repudiates the contract before the time for his or her performance has arrived, the plaintiff has an election of remedies—he or she may . . . 'treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his [or her] remedies for actual breach if a breach does in fact occur at such time.' " (*Romano, supra,* 14 Cal.4th at p. 489.) In other words, so long as the promisee treats the repudiation as an empty threat, the promisor has time to retract its threat and perform on the contract.

Applying that scenario here, Rosenthal was not injured, and the fraud not complete, until Bella and Harris made good on their threat not to pay commissions. If, as alleged, Gordon and Schwartz encouraged Bella and Harris not to pay Rosenthal 10 percent by persuading them that they could pressure Rosenthal not to exercise his contract remedies, then Gordon and Schwartz assisted Bella and Harris in completing the fraud. "[A] defendant who assists in an *ongoing* tort may be held liable as a

32

coconspirator." (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1595-1596.)

Gordon and Schwartz argue that Rosenthal's cause of action for conspiracy fails because he does not allege he relied on their "false narrative," and was thus not harmed by it. We disagree. A plaintiff alleging conspiracy to defraud need not allege reliance on every coconspirator's misrepresentation in furtherance of the fraud. He need only allege the coconspirators assisted the principal's fraud.

### b.     Breach of Fiduciary Duty--Schwartz

The elements of a claim for breach of fiduciary duty are " '(1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach.' " (*O'Neal v. Stanislaus County Employees' Retirement Assn.* (2017) 8 Cal.App.5th 1184, 1215.) A fiduciary relationship may arise when a person places trust and confidence in the integrity of another who voluntarily accepts the confidence; once accepted, the confidant cannot act so as to take advantage of the other's interests without their knowledge or consent. (*Tri-Growth Centre City Ltd. v. Silldorf, Burdman, Duignan & Eisenberg* (1989) 216 Cal.App.3d 1139.)

Rosenthal alleges that he and Schwartz were in a business relationship in which they shared commissions and Schwartz invoiced Bella on Rosenthal's behalf.

Schwartz does not dispute that this signifies a fiduciary relationship. Instead, he argues that in the third amended complaint Rosenthal denies any partnership between the two. Schwartz argues that this denial precludes any factual finding that he and Rosenthal were in a fiduciary relationship. We disagree. Although a partnership will likely involve a fiduciary relationship, it is not the only sort of business arrangement that

33

may give rise to a fiduciary relationship. Even in the absence of a partnership one may repose confidence in the integrity of another such that that party cannot act so as to take advantage of the principal's interests without their knowledge or consent. For example, Rosenthal alleges he and Schwartz were in business together, they were family friends, he trusted Schwartz to negotiate on his behalf, and they shared commissions. For his part, Schwartz alleges in his answer that Rosenthal authorized his conduct with respect to the Bella commissions and is estopped from asserting his rights against Schwartz. At the demurrer stage, and indulging all inferences in Rosenthal's favor, we cannot conclude that as a matter of law Rosenthal and Schwartz were not in a fiduciary relationship.

### c. Interference Claims—Schwartz

California recognizes two theories upon which the tort of interference with economic relations may be based. (*Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1142.) "[W]hile intentionally interfering with an existing contract is generally 'a wrong in and of itself' [citation], intentionally interfering with prospective economic advantage requires pleading that the defendant committed an independently wrongful act." (*Ibid.*)

Interference claims generally require that the allegedly interfering party be a "stranger" to the contract or prospective economic advantage. (*Mintz v. Blue Cross of California* (2009) 172 Cal.App.4th 1594, 1603; *Shamblin v. Berge* (1985) 166 Cal.App.3d 118, 122-123 [interference torts require that a contract or prospective economic advantage be with a third-party].) In other words, a person generally cannot interfere with his or her own relationship or contract.

34

Rosenthal alleges that Schwartz, to reap financial benefits for himself and his wife (Gordon), interfered with Rosenthal's contract and prospective economic relationship with Bella by reassuring Bella and Harris that Rosenthal would accept a 1 or 2 percent commission. As a result, Rosenthal alleged, Bella and Harris refused to pay Rosenthal a 10 percent commission per the March 2020 agreement.

These allegations are sufficient to state a cause of action for interference with contract and economic relations.

Schwartz argues he was "no stranger" to Rosenthal's contract or relationship with Bella and Harris and that he therefore cannot be held liable for interfering with his own relationship with them. He argues that Rosenthal admitted his (Schwartz's) relationship with Bella and Harris by alleging that both Rosenthal and Schwartz would make referrals, Bella and Harris agreed to pay both of them, and Rosenthal and Schwartz had a separate agreement to share commissions. We disagree. These allegations certainly establish some connection between Schwartz, Bella, and Harris, but do not as a matter of law establish that Schwartz was a party to Rosenthal's contract or relationship with Bella or Harris. Whether he was so close to the relationship as to be virtually a party to the contract is a question of fact not to be resolved on demurrer.

Schwartz also argues that Rosenthal could not have been harmed by his actions because his alleged interference took place after April 5. At that point, Schwartz argues that the March 2020 agreement ended. For the reasons discussed above, we disagree. After its April 5, 2020 repudiation of the March 2020 agreement, Bella and Harris still had time to retract the repudiation and perform on the agreement. Rosenthal alleges that due to Schwartz's interference, Bella and Harris declined to do so.

We conclude the trial court improperly sustained Gordon's demurrers. This holding does not affect the judgment as to Rosenthal's cause of action for fraud against Gordon and Schwartz, which he voluntarily dismissed without prejudice.

## DISPOSITION

The judgment is reversed. Appellant is to recover his costs on appeal.

NOT TO BE PUBLISHED

KLATCHKO, J.[*]

We concur:

BENDIX, Acting P. J.

WEINGART, J.

---

[*] Judge of the Riverside County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.